Robert Anthony **CARTER**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 68982.

Court of Criminal Appeals of Texas, En Banc.

Sept. 17, 1986.

---

Ronald G. Mock (Court appointed) (Janet Seymour Morrow, Catherine E. Greene, of counsel), Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and James C. Brough and Brian Rains, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This appeal is taken from a conviction for capital murder. V.T.C.A., Penal Code, § 19.03(a)(2). The death penalty, V.T.C.A., Penal Code, § 12.31(a), was assessed by the court after the jury returned affirmative findings to the three special issues submitted pursuant to Article 37.071, V.A.C. C.P.

Appellant raises seven grounds of error, two of which allege there was insufficient evidence to support the "Yes" answers to special issues one and two under Article 37.071, supra. A recitation of the facts is rendered necessary.

The indictment, in pertinent part, alleged the appellant on or about June 24, 1981 "did then and there unlawfully while in the course of committing and attempting to commit the robbery of Sylvia Reyes, hereafter styled the complainant, intentionally, cause the death of the complainant by shooting the complainant with a gun...."

About 4:30 p.m. on June 24, 1981, Officer M. Rodriguez of the Houston Police Department was dispatched to the scene of a reported robbery at a Conoco service station and convenience store at 333 South Wayside in Harris County. Upon arriving at the scene, Officer Rodriguez found Sylvia Reyes, manager of the station, lying directly between the store's counter, face up and unconscious. Reyes had been shot in the chest. An ambulance arrived and Reyes was taken to the hospital where she later died the same day. Dr. Vladimir Parungao, Assistant Medical Examiner of Harris County, performed an autopsy. The cause of death of the 18–year-old[1] Reyes was a gunshot wound to the chest which entered the thoracic cavity and lacerated the heart, and damaged the left lung and leaf of the diaphragm. A bullet was recovered from a muscle in Reyes' back.

At the scene Officer Rodriguez discovered the cash drawer behind the counter was halfway open. Witnesses gave Rodriguez a brief description of the suspect as being a young black man wearing a white T-shirt and cutoff shorts. Detective J.K. Newman, who also arrived at the scene, observed the cash drawer was open and contained some change but no "cash bills."

David Josa testified that on June 24th he had gotten gas at the Conoco station and was entering the station to pay for the gas when he heard "a bang inside" which he took to be a gunshot. He retreated a few steps. One man came out of the station and turned right and ran. Josa retreated a

1. The record at various times refers to the deceased as 17, 18 and 19 years of age.

few steps more when a second man emerged from the store with a "wad of money" in his left hand. He described the second man as a young black man, 18 to 20 years old, 5' 10" or 6' tall, wearing a T-shirt, cutoffs and athletic type shoes with a cap on his head. He did not see a gun. The man fled across Wayside and behind some plants on Industrial Road. Josa saw the man for only a few seconds. He could not identify appellant in court as being the same man. Josa saw the first man return to the station later and talk to the police.

Arthur Mallard identified himself as the first man out of the station. Mallard testified he stopped every afternoon at the store for cigarettes and beer. Mallard observed two employees in the store and "another guy" to whom he paid no attention until he (Mallard) turned to go to the counter to pay for his beer. At this point he saw the man reaching behind the counter getting money. Mallard described the black man as about 19 or 20 years old, about 5' 11" or 6' tall, medium built, and wearing a white T-shirt.

Mallard testified that after the man was reaching behind the counter getting money the woman behind the counter jumped off a bar stool and said "No" and tried to close the cash register drawer on his left hand. Mallard could not see the man's right hand. At this point Mallard heard a shot, and he turned and ran out of the store. He ran as far as a nearby golf course, but later returned to the scene and found the woman identified as Reyes lying on the floor. She had been shot in the chest. He was unable to identify appellant in court as the man he had seen.

Mary Estrada, cashier at the Conoco station and store, testified her shift was from 7 a.m. to 4 p.m. on June 24, 1981, and that the deceased, Sylvia Reyes, came to relieve her shortly before 4 p.m. and to work the next shift. Estrada testified she left Reyes at the counter and went to the stock room to do some work before leaving. At the time she estimated there was approximately $200.00 in bills and change in the cash drawer behind the counter. While in the stock room, she heard a loud sound and thought an overhead light had exploded. She called to Reyes several times and received no response. About five minutes later she returned from the stock room but could not see Reyes. Estrada found Reyes behind the counter with a bullet wound. She observed the cash drawer was open and all the bills were gone. Estrada testified they kept no weapon at the station. Estrada testified she had never seen the appellant before.

On June 27, 1981, an extrajudicial confession was obtained. The State offered a portion of the confession which read:

"On Wednesday, June the 24th, I was at the park again and I was with Roosevelt, I don't know his last name, and with Baron Domino.

"Richard Lynn came up in his car, a red cadillac about '77 or '76 model. Some time in the afternoon we got into Richard's car and Roosevelt said he knew where a gas station was that was good to rob. Richard drove to the gas station. I don't know which street it was on. The building was white I think and it was made like a circle. On the way over there Baron gave me a gun. This time it was a .38.

"It was black or dark blue with brown handles. I don't know where he got it. I had on short blue pants, they had lines on them, they were all blue. I had on a white T-shirt with a colored bird that my brother drawed on the back of it. I had on a blue golf hat and I put the gun in the front pocket of my pants. I got out of the car and went into the gas station and the others stayed in the car across the street behind some company. I went in. There was some people in there and I was going to wait until they left but they wouldn't leave. So I went on up to the counter and pulled the gun out and said 'this is a robbery'. There was a lady, she looked young, she was a white lady, she said something like 'uh uh'.

"I reached over in the drawer that had money in it and grabbed the money. I shot the lady in the chest and then I

reached in and got the money. I ran out of the station and across the street to the car and got in and took off. I gave the gun back to Disco, that is what I called Baron Domino. He took the bullet out I had shot and put another one in the gun. I don't know what he did with the shell. We went to Roosevelt's in the Coke Street Apartments toward the back of apartments. We counted the money. There was about a $150.00. I got $37.00 and so did Roosevelt. Richard and Disco got about 38. I went on home and gave my mother some of the money. $10.00 of it and then I went back to the park."

Appellant then offered the excluded portions of the confession which added after "I reached over the drawer that had money in it and grabbed the money" the words *"Before I did I was trying to uncock the gun and it accidentally went off."* Appellant also offered the State-excluded portion of the confession reading, "I would like to say that I didn't mean to kill. I am not a violent person."

Detective Newman was recalled by the State and testified that after appellant had given a statement he brought Baron Green, known as Baron Domino and "Disco," to the police station and that he subsequently recovered a .38 caliber revolver from the apartment of Baron Green's mother. The revolver was admitted without objection.

Officer C.E. Anderson, a firearms examiner for the Houston Police Department, testified that the bullet recovered from Reyes' body was fired from the revolver admitted into evidence. He explained the weapon could be fired by cocking the hammer and then pulling the trigger or simply by pulling the trigger.[2]

The defense rested with the State at the guilt stage of the trial.

At the penalty stage of the trial the State called witnesses to testify about the shooting of R.B. Scott during the course of a robbery at Espinola Supply or Beauty Store on June 18, 1981,[3] approximately six days before the instant offense.

Dolores McClinton testified she was in Scott's beauty store about 5 p.m. on June 18 to buy hair rollers and conditioner. Besides Scott, she observed a young black man beside the aisles and noticed a yellow object in his hand. As she left the store she heard a "pop" which she assumed was a firecracker. As she walked to her car, she heard another "pop" and looked back. The young black man ran out of the store and passed her. Scott came out of the store waiving his hand and McClinton could see blood stains on his shirt. McClinton could not identify appellant as the man she saw in the store and who ran therefrom.

Catherine Bush, while in front of a school, heard two noises like firecrackers and then heard someone holler "Stop him, Stop him." Bush then saw someone running from the direction of the beauty store, who then ran past her. She identified appellant as the person who ran passed her on June 18.

Detective L.B. Smith testified that when he arrived at the scene Scott was already dead, having been shot in both the right and left sides of the chest. The autopsy report and stipulation showed the cause of death to be two gunshot wounds to Scott's chest.

Detective Smith also related he took an extrajudicial confession from appellant concerning the extraneous offense. The State offered the confession which reads:

"Last week I think it was on a Friday would be June 19th of 1981, I was playing basketball at Finnagin Park on Providence. A couple of guys I know, black

---

**2.** Anderson testified on direct examination it would be possible to uncock the revolver with one hand, though the safest way was with two hands, and one would not want to point the weapon at anyone else while uncocking it. On cross-examination he testified this would be dangerous, and he thought it would take "a very

reckless and foolish person" to point the weapon at another person while uncocking the weapon.

**3.** At various places in the record the date is referred to as June 19th, some five days before the instant offense.

guys, by the name of Peewee and Baron Domino came up to me. I don't know Peewee's real name. I only know him as Peewee.

"They were with a guy name Bobby Punch. It was an old cadillac. They said they wanted to go and rob the Espinola Beauty Salon on Lockwood passed the Eastex Freeway from my house. They told me to go in and rob the store and they would pick me up behind the store. They let me out in back of the store and I walked around and went in. I asked about some TCB, some stuff to put on your head to make it look curly. There was two customers in there, a woman and a man. I waited until they left. I walked up to the counter. The old man was on the other side of the counter. I was talking about the stuff on my hair. I picked up this bottle when the people were in the store before I walked over to the old man. I pulled up the front of my shirt. I had a yellow shirt on with little holes in it. I had Baron Domino's gun stuck down in the front of my pants. He had given it to me in the car. It is a .22 it is the kind you have to turn around a little wheel and put in the bullets. It has white handles and looks silver like. It has black paint on it. I grabbed my gun and fixing to tell him to give me all of the money out of the cash register. But before I could say it he said something. I don't remember exactly what, something like 'you little bastard' and grabbed my shirt. I pulled the gun out and tried to reach for the door but he grabbed me and I shot him. His arm was on me and when I shot the first time I think I shot him in the arm. He was still grabbing me and I shot him again. I wasn't looking a second time I shot. I grabbed for the door and went out of there. I ran down toward the fruit stand and around the corner away from Lockwood. The other three guys were waiting for me in the black cadillac about two blocks away. I got in the car with them. I gave the gun back to Baron and they took me to Baron's apartment on Market

street close to my house. I got out and went in and changed clothes to some short pants, blue jeans and a T-shirt, I think. None of the other guys got out with me. They just dropped me off and went on. After I changed clothes I went back to the park. I told a guy named Little C about it. Later I played some more basketball and then me and Bobby Punch and two gals went to the Checkered Board Squares, a gameroom in the Third Ward."

Detective Smith also testified appellant's reputation for being a peaceful and law-abiding citizen was "bad."

Dorothy Carter Bryant, appellant's mother, testified for the defense. She stated appellant's father left her and the children when appellant was three years old. She also stated the then 18–year–old appellant had dropped out of school in the tenth grade and went to Job Corps where he had received two certificates. Later he worked as a cook at Popeye's Chicken restaurant, gave her money and got along well with his siblings, that he was not a disciplinary problem, and she would help to rehabilitate her son if he got a life sentence.

Alberta Wendell, a friend of appellant's mother, testified she had known appellant since he was eight or nine years old and he had not given his mother any trouble. She would be willing to help appellant to rehabilitate himself if possible.

The appellant testified at the penalty stage of the trial that he was born on September 10, 1964 and had never been convicted of a felony until the guilt stage of the trial. If given a life sentence he would "go to school, work hard and try to get me a trade"; that he had been a smart student. He related that to get along with the gang he would be inclined to do what they told him. When asked on direct examination to explain to the jury what happened when "the gun went off and killed that girl" appellant didn't remember but that he had entered the station to commit robbery. The record also reflects:

"Q. (Defense Counsel) Are you sorry you did it because there are two dead people or because you got caught?

"A. Sorry because there are two dead people plus I got caught."

On cross-examination he admitted it was wrong to have a gun, wrong to rob and wrong to kill people. When asked why he killed the 62 or 63–year–old Scott, he claimed Scott choked him, and when asked why he, five days or so later, killed Reyes, he answered, "I don't know. It was an accident." The record then reflects:

"Q. (Assistant D.A.) All of it was an accident. Is that what you would have done the next time you went out with those guys and killed somebody else would you just keep calling it accidents?

"A. No, sir because I ain't going next. In prison and locked up.

"Q. They got caught up too didn't they?

"A. Yes, sir.

"Q. Only reason you stopped, is you got caught yourself, isn't it?

"A. Yes, sir. They snitched on me.

"Q. Sir?

"A. Plus they gave me up.

"Q. The only reason you stopped robbing and killing is you got caught, isn't it?

"A. No, sir, I knew it was wrong.

"Q. You stopped because you knew it was wrong?

"A. Yes.

"Q. Why didn't you stop on June 18 when you killed that man if you knew it was wrong?

"A. I don't know, sir."

When asked that if people put a gun to his head and told him to rob or they would kill him he answered "They always play me like that. *.* * Playing with guns and stuff."

Appellant then related that when he said he didn't want to rob people, Baron Domino would get mad, pull a gun and say he was going to shoot him while playing with the gun. He didn't know why they selected him to do it.

On redirect examination the record reflects:

"Q. Robert Anthony, in both of these tragedies you were minding your own business when some other people came and got you and took you to a place and gave you a gun and told you to rob it, is that right?

"A. Yes, sir."

Appellant contends that the evidence was insufficient to support the jury's answer of "Yes" to the special issue number one submitted to the jury at the penalty stage of the trial under Article 37.071(b)(1), V.A.C. C.P.[4]

Appellant argues that in evaluating the evidence on special issue number one the evidence of the extraneous offense of the shooting of Scott should not be considered. Appellant concedes that the extraneous offense may have been admissible as to the second special issue under the provisions of Article 37.071(a), V.A.C.C.P., in that at the penalty stage "evidence may be presented as to any matter the court deems relevant to sentence," but some evidence should not be used by the jury or a reviewing court in determining whether the offense charged was committed deliberately "and with reasonable expectation that the death of the deceased or another would result."

The statute, of course, has been interpreted to give a trial judge broad discretion in determining just what constitutes "relevant" evidence at the penalty stage of a capital murder case. *Cass v. State,* 676 S.W.2d 589, 591 (Tex.Cr.App.1984). See also *Smith v. State,* 683 S.W.2d 393, 405

---

**4.** Article 37.071(b)(1), V.A.C.C.P., reads:

"(b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:

"(1) whether the conduct of the defendant that caused the death of the accused was committed deliberately and with the reasonable expectation that the death of the deceased or another would result; ..."

(Tex.Cr.App.1984); *Smith v. State*, 676 S.W.2d 379, 390 (Tex.Cr.App.1984). It has also been consistently held that unadjudicated extraneous offenses are admissible at the penalty stage of a capital murder trial absent a showing of unfair surprise. *Smith*, 683 S.W.2d at 406; *East v. State*, 702 S.W.2d 606, 614 (Tex.Cr.App.1985); *Nethery v. State*, 692 S.W.2d 686, 692 (Tex. Cr.App.1985); *King v. State*, 657 S.W.2d 109, 110 (Tex.Cr.App.1983); *Sanne v. State*, 609 S.W.2d 762 (Tex.Cr.App.1980). And it has been said that admission of such offenses does not render proceedings fundamentally unfair or deprive an accused of due process or equal protection of the law. *Nethery*, supra, at 709; *Smith*, 676 S.W.2d at 406; *Williams v. State*, 622 S.W.2d 116 (Tex.Cr.App.1981), cert. den. 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876.

In *Wilder v. State*, 583 S.W.2d 349, 361 (Tex.Cr.App.1979),[5] this Court held that statements made by a defendant detailing participation in a similar extraneous offense as the one charged were relevant to the jury's determination of *all three* questions under Article 37.071(b), supra, "They [the statements] shed light on both deliberateness and appellant's future criminal tendencies." See also *Sanne v. State*, 609 S.W.2d 762, 773 (Tex.Cr.App.1980).

Although appellant concedes the extraneous offense was admissible for one purpose (future dangerousness) he urges it was not admissible for consideration in connection with the first special issue (deliberateness).

■ It is observed that there was no objection on this basis at the time the evidence of the extraneous offense was offered. There was no objection to the court's charge or a request for limiting instructions. It does not appear that the claim now advanced on appeal was preserved for review. Cf. *Howell v. State*, 563 S.W.2d 933 (Tex.Cr.App.1978).

■ The circumstances of the offense charged can alone sustain an affirmative

answer to a special issue submitted under Article 37.071, supra; *Smith v. State*, 676 S.W.2d 379, 393 (Tex.Cr.App.1984); *Fierro v. State*, 706 S.W.2d 310, 319 (Tex.Cr.App. 1986); *Russell v. State*, 665 S.W.2d 771, 781 (Tex.Cr.App.1983), cert. den. 465 U.S. 1073, 104, S.Ct. 1428, 79 L.Ed.2d 752; *Mitchell v. State*, 650 S.W.2d 801, 812 (Tex. Cr.App.1983).

■ In the instant case the evidence shows that appellant alone entered a service station and convenience store, armed with a .38 caliber weapon. His purpose was robbery. He reached into the cash drawer. The deceased told him "No" and tried to shut the drawer on his left hand. She was then shot in the chest, and appellant in his confession stated, "And then I reached in and got the money." He then fled the store and divided the money with his awaiting confederates.

"Deliberately" as used in Article 37.071, supra, is to be taken and understood in its normal use in common language. *Stewart v. State*, 686 S.W.2d 118 (Tex.Cr.App.1984); *Cannon v. State*, 691 S.W.2d 664 (Tex.Cr.App.1985). Appellant's affirmative conduct reflects a "continued persistence" indicative of deliberateness. See Black's Law Dictionary (Fourth Rev.Ed.1968) at 1343.

■ The State was not bound to prove that the defendant carefully weighed or considered or carefully studied the situation immediately prior to killing the deceased in order for the jury to answer the first special issue under Article 37.071, supra, "Yes." *Granviel v. State*, 552 S.W.2d 107, cert. den. 431 U.S. 933 (1976); *Smith v. State*, 676 S.W.2d 379, 393 (Tex.Cr.App. 1984).

The evidence also reflects that six days earlier appellant entered a beauty supply store. He was armed and his purpose was robbery. When appellant's purpose was revealed and the owner, Scott, grabbed

---

**5.** Wilder's conviction was vacated, 453 U.S. 902, 101 S.Ct. 3133, 69 L.Ed.2d 987, on remand 623 S.W.2d 650. *Wilder* was overruled in *Green v. State*, 682 S.W.2d 271, cert. den. 470 U.S. 1034,

105 S.Ct. 1407, 84 L.Ed.2d 794, holding law of parties may not be applied to punishment issues in capital murder cases. The above was not affected.

him, appellant shot Scott twice in the chest, causing his death. He then fled and joined his awaiting companions.

Appellant did not deny his purpose was robbery, but claimed that just before reaching for the money in the Conoco cash drawer he was trying to uncock his revolver and it went off accidentally, striking Sylvia Reyes in the chest. He stated he was easily dominated, was coerced by others and threatened with a gun by Baron Domino to commit both offenses. It was for these reasons he committed both offenses. He did not explain why, after he was given a weapon, and was away from his companions, that he did not try to escape.

The jury was the trier of the facts, judge of the credibility of the witnesses and the weight to be given to their testimony.

Viewing the evidence in the light most favorable to the jury's finding, see and cf. *Jackson v. Virgina*, 443 U.S. 307, 319, n. 12, 99 S.Ct. 2781, 2789, n. 12, 61 L.Ed.2d 560 (1979), and *Wilson v. State*, 654 S.W.2d 465 (Tex.Cr.App.1983) (Opinion on rehearing), we find the evidence sufficient to support the jury's affirmative answer to special issue number one. *Milton v. State*, 599 S.W.2d 824 (Tex.Cr.App.1980), cert. den. 451 U.S. 1031, 101 S.Ct. 3022, 69 L.Ed.2d 400; *Rumbaugh v. State*, 629 S.W.2d 747 (Tex.Cr.App.1982); *Fearance v. State*, 620 S.W.2d 577 (Tex.Cr.App.1980), cert. den. 454 U.S. 899, 102 S.Ct. 400, 70 L.Ed.2d 215; *King v. State*, 631 S.W.2d 486 (Tex.Cr.App.1982), cert. den. 454 U.S. 928, 103 S.Ct. 238, 74 L.Ed.2d 188; *Smith v. State*, 676 S.W.2d 379 (Tex.Cr.App.1984); *Russell v. State*, 665 S.W.2d 771, cert. den. 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752; *Green v. State*, 682 S.W.2d 271, cert. den. 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794; *Penry v. State*, 691 S.W.2d 636 (Tex.Cr.App.1985); *De Garmo v. State*, 691 S.W.2d 657 (Tex.Cr.App.1985); *Can-*

*non v. State*, 691 S.W.2d 664 (Tex.Cr.App. 1985).

Next appellant urges that the evidence was insufficient to support a "Yes" answer to special issue number two submitted under Article 37.071(b)(2), V.A.C.C.P.[6]

In answering special issues under Article 37.071, supra, at the penalty stage of a capital murder trial the jury may consider all of the evidence adduced at the guilt stage of the trial as well as that introduced at the penalty stage. *Bravo v. State*, 627 S.W.2d 152 (Tex.Cr.App.1982); *Smith v. State*, 676 S.W.2d 379, 393 (Tex.Cr.App.1984). And the circumstances of the capital offense charged, if severe enough, can be sufficient to sustain an affirmative finding as to a defendant's likelihood to commit future acts of violence. *Hawkins v. State*, 660 S.W.2d 65 (Tex.Cr.App.1983); *Williams v. State*, 668 S.W.2d 692 (Tex.Cr.App.1983); *Turner v. State*, 698 S.W.2d 673, 675–76 (Tex.Cr.App.1985).

Appellant argues that even with proof that a few days earlier he had killed Scott during the course of committing or attempting to commit robbery, the evidence, at both stages of the trial, was insufficient to prove beyond a reasonable doubt that he, 17 years and nine months old at the time of the offense, would be a continuing threat to society.

The facts of the instant case show a brutal assassination of 17 or 18–year–old Sylvia Reyes when she protested and tried to prevent appellant from taking money from the store where she was manager. Only five or six days prior thereto he had executed Scott, the owner of another store, when Scott grabbed him or choked him trying to prevent a robbery. In both instances his purpose was robbery and he went armed. He shot both Reyes and Scott in the chest, killing them. Appellant testified he was sorry two people were dead "plus I got caught." When asked if

---

**6.** Article 37.071(b)(2), V.A.C.C.P., reads:
 "(b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:
  \*    \*    \*    \*    \*    \*

 "(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; ..."

the only reason he stopped killing was because he got caught, he answered "Yes, sir. They snitched on me." Then he denied getting caught was the only reason he stopped, but stopped because he knew it was wrong. He didn't know why he didn't stop after killing Scott. Appellant referred to both shootings as accidents, and when asked if he did it again if he would call it an accident, he answered, "No, sir because I ain't going next. In prison and locked up."

One witness testified appellant's reputation as a peaceful and law-abiding citizen was "bad."

The defense argues that appellant was 17 years old at the time of the offense and had no prior criminal record; that his father left home when appellant was three years old; that he was under the domination of a gang, particularly one Baron Domino, who gave him the guns to commit the offenses.

In *Robinson v. State*, 548 S.W.2d 63 (Tex.Cr.App.1977), this Court discussed some factors which may be considered by the jury in passing on future dangerousness.

"This Court has stated that in determining the likelihood of whether or not a defendant would be a continuing threat to society, the jury could consider whether the defendant had a significant criminal record. It could consider the range and the severity of his prior criminal conduct. It could further look to the age of the defendant and whether or not at the time of the commission of the offense he was acting under duress or under the domination of another. It could also consider whether the defendant was under an extreme form of mental or emotional pressure, something less, perhaps, than insanity but more than the emotions of the average man, however inflamed, could withstand." (Citations omitted.) *Robinson*, supra, at 64.

While the jury was entitled to take into account appellant's age and lack of a criminal record, it is true that a defendant's "youth and clean prior criminal history do not act as a talisman against capital punishment." *Turner v. State*, 698 S.W.2d 673, 677, n. 4 (Tex.Cr.App.1985). In *Earvin v. State*, 582 S.W.2d 794, 799 (Tex.Cr.App.1979), it was stated:

"Notwithstanding the age of appellant and his lack of a prior criminal record, we find, that the *record as a whole* supports the jury's affirmative answer to the second question concerning future conduct." (Emphasis added.)

See also *Cannon v. State*, 691 S.W.2d 664 (Tex.Cr.App.1985) (where defendant was also a 17–year–old at time of offense).

Although he did not raise the defense of duress at the guilt stage, appellant did offer evidence of domination and threats by Baron Domino and others. See *Robinson*, supra, at 64; *Williams v. State*, 668 S.W.2d 692, 696 (Tex.Cr.App.1983). The evidence was not very convincing. The jury was the trier of the facts and it was not required to accept appellant's version of the facts and could have reasonably decided that he voluntarily participated in the robberies resulting in two murders committed individually.

■ There was no record of prior convictions and there was no psychiatric testimony. Of course, psychiatric testimony is not essential to support an affirmative answer to the question of future dangerousness. *Mitchell v. State*, 650 S.W.2d 801 (Tex.Cr.App.1983); *Williams v. State*, supra, at 695.

■ Viewing the evidence in the light most favorable to the jury's verdict, see and cf. *Jackson v. Virginia*, supra; *Wilson v. State*, supra; see also *Starvaggi v. State*, 593 S.W.2d 323 (Tex.Cr.App.1979), we find the evidence sufficient to support the jury's affirmative finding to the second special issue under Article 37.071, supra. See and cf. *Crawford v. State*, 617 S.W.2d 925 (Tex.Cr.App.1980), cert. den. 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 431; *Hawkins v. State*, supra; *Russell v. State*, supra; *Green v. State*, 682 S.W.2d 271 (Tex.Cr.App.1984); *Smith v. State*, 683 S.W.2d

393 (Tex.Cr.App.1984); *Thompson v. State*, 691 S.W.2d 627 (Tex.Cr.App.1984).

In two grounds of error appellant claims the trial court's exclusion of prospective jurors, Irene Harding and Veda Bryant, were in violation of the requirements of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

The court initially inquired of Veda Bryant, a school teacher, on voir dire examination. When asked how she felt about the death penalty, she told the court:

"Well, I've always thought before I was here that I believe in it—that I did but now I feel uncomfortable that I may be on a jury in judgment of someone else's life so I'm kind of confused and uncomfortable."

Bryant pointed out she had "no trouble" with the two prior robbery cases on which she served as a juror, but the death penalty "bothered" her, that she wouldn't want to be "a party to it," that she had always been fair but she had "never come up against this."

The record then reflects:

"Q. (Court) Now if the State proved to your satisfaction that the answer to that question (Special Issue No. 2) should be yes, would you answer it no so as not to participate in a verdict that would result in the death of a defendant?

"A. No, I would have to answer it truthfully if I felt it was yes, I would have to answer yes.

"Q. And you know by answering yes that you would be writing a death verdict?

"A. Yes.

"Q. And you could do that?

"A. I could."

"Q. It would be hard?

"A. Yes."

The record then reflects:

" ... Would it influence you in such a way that you would automatically answer it no so that—or refuse to answer it so that the defendant would not be executed?

"A. No, I think I would have to go with whatever the evidence was. I just would not have to think about the verdict I guess. I've just never been put in a position like this. It's just something new."

When asked if her uncomfortableness, her disbelief in the death penalty, now would affect her answers to the questions, she replied:

"A. That's what's making me so confused. I feel like I should follow the rules. If all this evidence and those were proven the answer was yes I would have to say yes *and yet I don't know about this other feeling I have now.*

\*      \*      \*      \*      \*      \*

"A. *My conscience does get in my way. I think it would get in my way.*"

Bryant then told the court "it" would not affect her answer ... "It just this capital murder is the death penalty that bothers me. That's the other thing that bothers me." and "And everything else I know I could be fair." She then told the court she could follow the law and "didn't think so" when asked if she would automatically vote against the death penalty.

After some further explanation of the procedure, the prosecutor asked:

"Q. ... We care how you feel but just want to know what you can do in a given situation?

"A. Well, right now I don't know. *I guess maybe I should say I couldn't be fair then because I don't know* ... I want to follow all of the rules and *I want to be fair but this other feeling.*

"Q. Which bothers you more?

"A. I don't know, I guess the death penalty.

"Q. It would bother you to be on a jury and know that the answers are yes and not answer them yes?

"A. Yes.

"Q. But *it bothers you even more* being on a jury *knowing that if you answer them yes somebody is going to die* would that be a fair statement?

"A. *Yes.*

"Q. Which way would resolve it?

"A. I don't know but *maybe fair to everyone I should say that I might let my feelings interfere.* My personal feelings.

"Q. ... When it comes down to the questions can you put aside your personal feelings and answer the questions yes?

"A. I don't know if I can or not.

"Q. Well, *you have to decide.* Either you can or you can't.

"A. *No then.* Since I don't know I would say no, I guess I couldn't put aside my personal feelings.

"Q. So that even if the answer and let's pick number two—even if the answer was yes would you answer it no, knowing that he would get life rather than death?

"A. This is just hard for me. I read that and I say yes I could do it but then when I think about the verdict I would say no.

    *   *   *   *   *   *

"Q. ... *Would you answer one of those issues no even though you knew the answer was yes* so that the person would get life rather than death to satisfy yourself?

"A. *I think I would. I just don't know.*

"Q. So if it came down to it your belief is that you would answer one of them no so that he would get life rather than death?

"A. Probably.

"Q. You believe at this point in time?

"Q. Right now, yes, sir."

(Emphasis supplied.)

The prosecutor then challenged Bryant for cause, and appellant's counsel interrogated the prospective juror. His questions went a long way in rehabilitating Bryant. The record then reflects:

"... Would you violate the oath and would you automatically vote no just to make sure somebody got the life sentence as opposed to the death sentence even though you know the answer should be yes?

"A. This tears me up again.

"Q. I'm sorry.

"A. It's not you. I want to go by the rules and be fair and my Oath I took I would have to do what I felt was right.

"Q. Yes, ma'am. And if what you felt was right according to that oath you've taken and the laws and society that you also have to live in dictated that you answered yes could you answer yes?

"A. I think I would have to. If I took an oath and I said I had to do all this. I could do it *but I still have this feeling.*

"Q. Yes, ma'am, you don't like to. It's uncomfortable to you and you don't like it but you could do it if you had to?

"A. (Nods head affirmatively.)

"MR. MECK (Appellant's Counsel): She's qualified, Your Honor, and I'll pass her back."

The prosecutor then explained she had contradicted herself and she responded, "I know. I'm all confused." When asked if she could follow her oath even if it violated her conscience, she answered, "I just don't know. I just don't want to serve on this one. I don't mind the others I mean."

The court again interrogated:

"Q. As I understand it, you are saying that if the State proves the answer to these questions to be yes beyond a reasonable doubt that you could answer the questions yes even if you knew that the defendant would be executed?

"A. Well, *I know I say yes and then I say no.* I know I'm contradicting myself.

"Q. Then what are you saying? You tell me.

"A. I've always followed the law. I think we should follow the law and *yet I've never had this feeling. I've never been put in this position before.*"

When asked if the death penalty could affect her answers, she responded:

"A. I just wouldn't want the death penalty and yet I believe in it. I'm confused. I always thought I believed in it."

When asked if her feelings would cause her not to truthfully answer any of the questions, she responded:

"A. Well, that's what I told him. *I think yes, it would keep me from answering truthfully and then I answered him that it wouldn't.*

"Q. ... You see you can't say both, can you?

"A. I know that's what I'm saying. I know I am. I want to follow the rules *and yet I've got this feeling that I didn't know I had.* I meant that I put in this position. I follow the rules.

"Q. Ma'am?

"A. I follow the rules. I mean I usually do what's right. You know like in school and all. The kids and they all have rules and they're punished if they don't follow the rules but not this kind of punishment. So it's a little bit hard. Being undecided I'm going back and forth. I know it would be hard for me." (Emphasis supplied.)

The court sustained the challenge for cause by the State. Appellant's counsel did not ask for additional interrogation or object that the excusal was premature as now urged.

Early on prospective juror Irene Harding stated to the court "I don't approve of the death sentence." When asked if she could ever write a verdict that would result in the death of another human being, she answered, "No."

Further interrogation by the court reflects:

"Q. Then do I understand that you are saying that you would automatically vote against the imposition of capital punishment regardless of any evidence that might be developed in the case?

"A. If I let it go that far well, I wouldn't have any choice *but I don't plan to let it go that far.* That's why I'm speaking up now.

"Q. You would automatically vote against the death penalty in every instance?

"A. I believe so.

"Q. Well, you believe so?

"A. Yes. Unless some drastic change came over me because that's the way I feel.

"Q. You are saying then that it is your positive frame of mind that you could not and would not, under any circumstance regardless of what evidence might be, return a verdict that could carry with it the death penalty?

"A. No, I couldn't vote like that.

"Q. *You could not vote for the death penalty under any circumstance?*

"A. *Not unless I change which I haven't.*

(Emphasis supplied.)

Harding was just as emphatic in response to questions posed by the prosecution. She stated that she did not want to be a party to assessing the death penalty and that at the present time she would never vote for the death penalty.

The record also reflects:

"Q. You have indicated that you don't believe in capital punishment. Is that still your position?

"A. *I wasn't indicating. I said no.*" (Emphasis added.)

Even under the "most terrible facts," Harding stated she could not answer the special issues in such a way as to cause a defendant to die. After reaffirming that in

all cases she would answer "no" to one or all of the special issues, Harding was challenged for cause by the prosecutor.

Defense counsel succeeded in getting Harding to agree that she would answer "yes" to the special issues if the facts warranted such a reply. She explained:

"If the evidence showed that they were guilty [I] would say yes to the first two [special issues] but the sentence that's what I'm trying to say. *When it comes to the sentencing that's when I would do like I'm telling you now I wouldn't go into it because I don't believe it.*" (Emphasis supplied.)

The following colloquy with appellant's counsel helps to understand Harding's mind-set:

"A. I've already told you that I don't believe in the death penalty I don't see why I should take up all that time just to see if I'm going to say yes or no [to the special issues].

"Q. That's why we're asking you now.

"A. No.

"Q. You would automatically answer one of those questions no in spite of what you believe?

"A. No, I would have to answer the truth if I got to this. If I came to that I would have to answer the truth as I understood it.

"Q. You wouldn't want to do it because it would be on your mind?

"A. It would worry me.

"Q. But if you had to do it you could do it, couldn't you?

"A. I knew it was going to cause somebody—no.

"Q. That's what I asked you. A minute ago you said you would tell the truth.

"A. *I said I would answer these truthfully but I wouldn't go along with somebody being put to death.*" (Emphasis supplied.)

Finally appellant's counsel got Harding to answer:

"A. No, I wouldn't answer no if I was convinced of the fact. I would answer no."

Appellant then submitted Harding was qualified.

The Court again interrogated:

"Q. ... Is there any case regardless of how horrible it might be that you could ever write a verdict that would result in the death of a defendant?

"A. No, not of this moment no."

In response to further questions about the special issues Harding said the death penalty would influence her "but I would have to speak the truth and that would be fair. It wouldn't be fair to me because of the way I feel." She explained that she would be made to do "something" against her conscience and against her will.

The court then sustained the challenge for cause and appellant's counsel stated, "Please note our exception." The record then shows:

"THE COURT: I am and I think I've never done this but I think it is necessary. The record will reflect that the court has done the best he (sic) could in talking to the prospective juror and I think that both counsel has and having the benefit of talking face to face with the juror and having the opportunity of weighing what she said that there was no way that she could participate in a verdict that would result in the death of a defendant. Is that what you are telling me?

"A. Yes, sir.

"THE COURT: I am going to excuse her for cause."

In *Witherspoon v. Illinois,* supra, the United States Supreme Court held that a prospective juror may not be excluded by the trial court for cause unless that person makes it absolutely and unmistakably clear that 1) he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, or 2) that the prospective juror's attitude towards the death penalty would prevent him

from making an impartial decision as to the defendant's guilt.

In *Adams v. Texas,* supra, the question presented was whether Texas contravened the Sixth and Fourteenth Amendments of the United States Constitution as construed and applied in *Witherspoon* when it excluded members of the venire from jury service because they were unable to state under oath as prescribed by V.T.C.A., Penal Code, § 12.31(b), that the mandatory penalty of death or life imprisonment in a capital murder case would not affect their deliberations on any issue of fact.

The United States Supreme Court reversed the *Adams* conviction and set aside the death penalty imposed holding that *Witherspoon* and said § 12.31(b) may not coexist as separate and independent bases for excluding prospective jurors so as to permit exclusion under § 12.31(b) on a ground broader than permitted by *Witherspoon.* The Court noted, however, that although the State could, consistent with *Witherspoon* use § 12.31(b) to exclude prospective jurors whose views in capital punishment are such as to make them unable to follow the law or obey their oaths.

*Adams* at 448 U.S. at p. 46, 100 S.Ct. at p. 2527, said:

"If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but *also to answer the statutory questions without conscious distortion or bias.* The State does not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality.

\*      \*      \*      \*      \*      \*

"We repeat that the State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths." *Adams,* 448 U.S. at p. 52, 100 S.Ct. at p. 2529.

The standard set out in *Adams* was as follows:

"This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.* The State may insist, however, that jurors will consider and decide the fact impartially and conscientiously apply the law as charged by the court." 448 U.S. at 45, 100 S.Ct. at 2526. (Emphasis in original.)

In *Williams v. State,* 622 S.W.2d 116, 118 (Tex.Cr.App.1981), it was held that certain veniremen whose views on the death penalty would have prevented or substantially impaired their performance as jurors in accordance with their instructions were properly excused in light of *Witherspoon* and *Adams.* See also *Bass v. State,* 622 S.W.2d 101, 108 (Tex.Cr.App.1981); *Porter v. State,* 623 S.W.2d 374 (Tex.Cr.App.1981); *Griffin v. State,* 665 S.W.2d 762 (Tex.Cr.App.1983); *Smith v. State,* 676 S.W.2d 379 (Tex.Cr.App.1984).

Still further in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the *Adams* standard was declared proper and preferable to the strict standards of *Witherspoon.* See also *Bell v. State,* 707 S.W.2d 52, 66 (Tex.Cr.App.1986). *Witherspoon* is no longer the standard for determining whether a challenge for cause by the State has been improperly granted. *Sharp v. State,* 707 S.W.2d 611, 620 (Tex. Cr.App.1986).

In *Wainwright v. Witt,* supra, the United States Supreme Court held in that case that in determining whether a prospective juror could be excluded for cause because of her views on capital punishment, the Court of Appeals, at minimum, erred in focusing unduly on lack of clarity of questioning of prospective jurors, and in focusing on whether her answers indicated that she would "automatically" vote against the death penalty.

There the Court wrote:

"We therefore take this opportunity to clarify our decision in *Witherspoon* and

to reaffirm the above-quoted standard from *Adams* as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' We note that, in addition to dispensing with *Witherspoon's* reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many venirement simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, *there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.* For reasons that will be developed more fully *infra, this is why deference must be paid to the trial judge who sees and hears the juror."*[7] *(Emphasis supplied.)*

It is also to be observed that Article 35.16(b), V.A.C.C.P., provides in part:

"(b) A challenge for cause may be made by the State for any of the following reasons:

"(3) That he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction *or punishment."* (Emphasis supplied.)

In fact, bias against the range of punishment applicable by law is a proper area of inquiry for both challenges for cause and peremptory challenges. *Mathis v. State,* 576 S.W.2d 835 (Tex.Cr.App.1979); *Martinez v. State,* 588 S.W.2d 954 (Tex.Cr.App. 1979).

With this background we return to the interrogation of prospective jurors Harding and Bryant. Harding made it clear from the beginning that she didn't approve of the death penalty and that she could not "under the most terrible facts" answer the special issues in such a way to cause a defendant to die. While she may have equivocated some in response to appellant's counsel's questions, she retreated from her answers where the death penalty was involved. At the conclusion she made clear to the court she could in no way participate in a verdict that would result in death. Harding would have been disqualified under the strict standards of *Witherspoon,* and we certainly conclude that under *Adams* her beliefs would have prevented or substantially impaired her performance as a juror in accordance with the court's instructions. The court did not abuse its discretion in sustaining the State's challenge. for cause.

The excusal of Bryant for cause presents a closer question. Bryant told the trial court the death penalty "bothered" her, but she would answer the questions truthfully, that she felt she should follow the rules but she didn't know about "this other feeling I have now," that she thought her conscience would get in the way. She didn't think she would automatically vote against the death penalty. She told the prosecutor she would be bothered by not answering a question "Yes" when it should be answered that way, but bothered even more by the fact her yes answer was going

**7.** Texas cases have also emphasized the deference that must be given to trial court's rulings on voir dire examination where the court had heard the prospective juror's tone of voice and observed his demeanor, etc. See *Tezeno v. State,* 484 S.W.2d 374 (Tex.Cr.App.1974); *Villareal v. State,* 576 S.W.2d 51 (Tex.Cr.App.1978); *Garza v. State,* 622 S.W.2d 85, 92 (Tex.Cr.App. 1981); *Smith v. State,* 683 S.W.2d 393, n. 5 (Tex.Cr.App.1984).

to mean someone was going to die, that she thought she would answer "No" even though the question should be answered yes so that "life" rather than death would be imposed, but she didn't know.

In his questioning, appellant's counsel did much to rehabilitate her. She told him she would do what she felt was right and follow the rules, but "still I have this feeling ... this tears me up."

She acknowledged to the prosecutor she had contradicted herself and did not know if she would follow her oath if it violated her conscience. She told the court she knew she was saying "Yes" and then saying "No," that she wanted to follow the rules "And yet I've got this feeling that I didn't know I had."

According to appellant Bryant is "a classic example of the vacillating juror who finally concludes she is undecided and is then prematurely excluded for cause." Bryant was questioned at length by both parties and the court. She did vacillate in her answers. At some point the court was called upon to rule upon the challenge for cause. The appellant did not ask for additional time to interrogate, though he now insists the exclusion was premature.

■ What was stated in Wainwright v. Witt, supra, is here applicable. " ... there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law ... this is why deference must be paid to the trial judge who sees and hears the juror." Applying the standard of *Adams*, we conclude that the trial court did not abuse its discretion in sustaining the challenge for cause of Bryant.

The State also argues that no error was preserved for review in the excusal of either Bryant or Harding, for at no time did appellant object on the ground that such excusals were in violation of *Witherspoon* and *Adams* as claimed on appeal. When Bryant was challenged at the conclusion of the interrogation, appellant's counsel stated, "We would object to it." When the

challenge for cause was sustained, appellant's counsel added, "Please note our exception to the Court's ruling, your Honor." When Harding was excused for cause, appellant's counsel simply stated, "Please note our exception."

It has been said the failure to specify in objections that a juror's exclusion was inconsistent with *Witherspoon* waives any such error on appeal. See *May v. State*, 618 S.W.2d 333, 349 (Tex.Cr.App.1981); *White v. State*, 629 S.W.2d 701, 705 (Tex. Cr.App.1981); *Smith v. State*, 676 S.W.2d 379, 387 (Tex.Cr.App.1984). See also *Boulware v. State*, 542 S.W.2d 677 (Tex.Cr.App. 1976). It would appear nothing is presented for review. *Boulware v. State*, supra.

■ Appellant argues that a general objection does not constitute waiver under a longstanding Texas rule that no waiver results from a general or imprecise objection where the correct ground of the objection was obvious to the trial court and opposing counsel. *Zillender v. State*, 557 S.W.2d 515 (Tex.Cr.App.1977). Reviewing the voir dire examination record of the prospective jurors Bryant and Harding, the pattern of questions, the sole interrogation of both Bryant and Harding being on feelings about the death penalty, etc., we conclude the ground of the objection was obvious to the trial court and to the State. No one was misled. We have reviewed on appeal appellant's contentions as to prospective jurors Bryant and Harding, and our decision is not based on the lack of a proper objection.

■ In another ground of error appellant claims he was denied the effective assistance of counsel by the failure of his trial counsel to specifically object to the exclusion of prospective jurors Bryant and Harding on the basis of a violation of *Witherspoon*, supra, and *Adams*, supra.

From the discussion above it is obvious that the contention is without merit. The objections were general, not specific, but for the reasons stated above there was no waiver or waivers in this case.

"In determining whether a defendant has received ineffective assistance of counsel, we use the standard set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): first, the defendant must show that counsel's performance was deficient; and second, the defendant must show that the deficient performance prejudiced the defense." *Wilkerson v. State* (Tex.Cr.App. No. 69,291—May 14, 1986). See also *Butler v. State,* 716 S.W.2d 48 (Tex.Cr.App.1986); *Ex parte Duffy,* 607 S.W.2d 507 (Tex.Cr.App.1980).

Appellant has not met the *Strickland* standard, and his ground of error is overruled.

Appellant next complains that the court's charge at the guilt stage of the trial was fundamentally defective because it included a jury instruction on "accident" not applicable to the facts of the case, and that such instruction deprived him of due process of law.

Appellant candidly concedes that a charge on "accident" has generally been considered a defensive charge, and a party will not normally be heard to complain of a jury instruction if the result can be characterized as one beneficial to such party. *Garrett v. State,* 642 S.W.2d 779 (Tex.Cr. App.1982).

Appellant acknowledges that there was no objection to the inclusion of the "accident" instruction, see Article 36.14, V.A.C. C.P., but contends the error should be reviewed pursuant to Article 36.19, V.A.C. C.P., in the interest of justice because the error was calculated to injure his rights and denied him a fair and impartial trial in violation of the due process guarantees of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, § 19 of the Texas Constitution.

Technically, accident is no longer a defense in Texas under the current Penal Code. *Williams v. State,* 630 S.W.2d 640, 644 (Tex.Cr.App.1982); *Davis v. State,* 692 S.W.2d 185, 189 (Tex.App.—Houston [1st Dist.] 1985), no pet. for review. The "function of the former defense of accident is

performed now by requirements of V.T. C.A., Penal Code, § 6.01(a), that 'A person commits an offense only if he voluntarily engages in conduct ....' " See also *George v. State,* 681 S.W.2d 43, 45 (Tex.Cr. App.1984).

In *Williams,* supra, at p. 644, it was stated:

"If the issue is raised by the evidence, a jury may be charged that a defendant should be acquitted if there is a reasonable doubt as to whether he voluntarily engaged in the *conduct* of which he is accused." (Emphasis in original.)

In the instant case the State offered appellant's extrajudicial confession excluding the exculpatory portion. The appellant then offered the portion of the confession in which he stated he was trying to uncock his weapon when the gun discharged, accidently striking the victim Reyes.

The court submitted to the jury the issue of capital murder in the course of a robbery as charged in the indictment. After applying the law to the facts with regard to capital murder, the court added:

"If you do not so find beyond a reasonable doubt or if you have a reasonable doubt thereof, you will acquit the defendant of capital murder and you will next consider whether or not the defendant is guilty of murder."

The court then submitted the lesser included offense of murder in the charge applying the law to the facts and concluded with

"If you do not so find beyond a reasonable doubt or you have a reasonable doubt thereof, you will acquit the defendant of murder."

The court then added:

"If you should find from the evidence beyond a reasonable doubt that the defendant is either guilty of capital murder or murder, but you have a reasonable doubt as to which offense he is guilty, then you should resolve that doubt in defendant's favor, and in such event, you will find the defendant guilty of the lesser included offense.

"If you have a reasonable doubt as to whether defendant is guilty of any offense defined in this charge, you will find the defendant not guilty."

This was followed by instruction of which appellant complains of on appeal.

"You are instructed that a person commits an offense only if he voluntarily engages in conduct including an act or an omission. Conduct is not rendered involuntary merely because the person did not intend the result of his conduct.

"Now if you believe from the evidence beyond a reasonable doubt that on the occasion in question the defendant was attempting to uncock the gun and it accidentally fired, killing the deceased, you will acquit the defendant and say by your verdict not guilty."

Appellant argues he was harmed by the supposedly beneficial charge that would appear to entitle him to acquittal and to which he did not object. Appellant contends there was no factual dispute about the events constituting the robbery except whether he was attempting to uncock the pistol when it went off. He noted that in the portion of his confession he introduced he had stated the pistol fired accidentally as he tried to uncock it and he had no intent to kill, and that the firearm expert called by the State testified on cross-examination that pointing a loaded gun at someone while trying to uncock it was a dangerous act, especially when the attempt was made with one hand. All of this testimony, he argues, if believed, proved an action that was dangerous to human life, involuntary and accidental.

Appellant then further argues:

The harm to Appellant flowed from the fact that all these facts as they developed did *not* entitle him to a charge informing the jury that if they believed the firing of the gun was accidental they had to acquit Appellant of *all* charges. Such facts would have entitled him only to a charge on 'felony murder' under V.T.C.A., Penal Code, Sec. 19.03(a)(3), authorizing conviction of one who in the course of a felony commits an act clearly dangerous to human life that causes the victim's death. A finding that the killing was accidental and hence unintentional did not in any way negate the proof offered upon the commission of the underlying robbery. Appellant was thus placed in the position of claiming the right to complete acquittal if the jury found the shooting accidental, when he had no such right, under the uncontroverted portion of the evidence concerning robbery."

This Court's recent decision in *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Cr.App. 1984) (Opinion on State's Motion for Rehearing), decreed that "Article 36.19 actually separately contains the standards for *both* fundamental error and ordinary reversible error." Consequently, an error in the jury charge which has been properly preserved by objection will call for reversal, so long as the error is not harmless.

"On the other hand, if no proper objection was made at trial and the accused must claim that the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short 'egregious harm.' " *Almanza,* supra, at 171.

Since appellant failed to object to the jury instruction at trial, his contention, if valid, must be reviewed pursuant to the more stringent prong of the *Almanza* rule involving "egregious harm." Such review requires an assessment concerning the degree of harm "in light of the entire jury charge, the state of the evidence including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza,* supra, at 171.

Appellant calls our attention to the unobjected to jury argument of the prosecutor, who after discussing the facts, stated:

" ... and Robert says I was trying to uncock the gun and it accidentally went off. Well, I submit to you if you believe that you're going to find him not guilty. If that's what you want to believe. I

can't stop you. If you think that that is reasonable in light of the evidence then you are going to find him not guilty."

He argues this argument stressed the fact that a finding of accident was a finding of not guilty. Appellant further notes the jury sent out a note during deliberations asking for a clearer definition of "intent" than the statutory definition given them in the charge of "intentionally," that the court refused to do so, and ten minutes later a verdict of guilty of capital murder was returned.

■ If we can assume that the court erred in giving the charge on accident, and further assume that this unobjected to error was somehow fundamental, we cannot say, applying the *Almanza* test, that the error was so egregious and created such harm as to deny appellant a fair and impartial trial. Appellant's ground of error is overruled.

Next appellant contends he was denied due process of law when during jury argument the prosecutor made a factual misrepresentation to the jury and told them they could not let the possibility of the death penalty affect their deliberation on the issue of guilt or innocence.

The argument complained of reads:

"This is one separate trial. They keep talking about the life of Robert Anthony Carter and how his life is on the line. Well, right now his life is not on the line. Maybe in a little bit if you find him guilty of capital murder but right now we're concerned with what Robert Anthony Carter did on June 24th, 1981. Not what may happen to him and *you all said you wouldn't let that affect your deliberations. I hope that you were telling the truth.* To find this defendant guilty of murder is to take a way out, to avoid the second part of the trial. Don't do that. That again would cheapen the life of Sylvia Reyes. Because they keep talking about his life. The charge talks about giving him the benefit of the doubt. Give him, give him, give him this, give him that. Well, it's about time that we start doing something for her.

"An 18 year old woman who happened to be in the wrong place at the wrong time. Find this murderer guilty of plain old murder is to tell this woman, her family, well Sylvia, I'm sorry. I submit to you that you're telling her and her family that she died for no reason and that ain't right. We've got to start thinking about the victims of these crimes. Sure it's nice to have rights for the defendant but when are we going to have rights for these people. And this is not a murder case. This is a capital murder case." (Emphasis supplied.)

This argument was not objected to by the appellant. He contends, however, that the jurors were never questioned on voir dire examination as to whether their deliberations on guilt might be affected by the possible penalties, and this was a misrepresentation made to the jury, and also left the implication they were under oath when they made these "statements." Appellant argues that the prosecutor was attempting to "exclude" the juror at this late stage of the trial upon broader grounds than allowed by *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). He further claims the error was compounded when the prosecutor urged the jurors to return a verdict of capital murder rather than murder because appellant deserved the result and the victim and her family deserved that result.

■ Putting aside any question of whether the argument was invited or was in response to defense argument, we observe it has long been the rule that an objection to improper argument must be made at the time of the argument to preserve any error for review. *Collins v. State*, 548 S.W.2d 368, 377 (Tex.Cr.App. 1976); *see also, Romo v. State*, 631 S.W.2d 504 (Tex.Cr.App.1982); *Euziere v. State*, 648 S.W.2d 700 (Tex.Cr.App.1983); *McMahon v. State*, 582 S.W.2d 786 (Tex.Cr.App. 1979). "An exception to the general rule occurs where the argument of the prosecutor is so prejudicial that an instruction to disregard will not cure the harm." *Romo,*

supra, at 505. Having reviewed the disputed arguments in question, we do not find them to be so prejudicial that they could not have been cured by the trial court's instruction. See *Williams v. State,* 682 S.W.2d 538, 546 (Tex.Cr.App.1984).

The prosecutor's remarks to the effect that "this is not a murder case," "[t]his is a capital murder case," reflects his subjective belief that the evidence in the present case was sufficient to convict appellant of capital murder rather than murder. Appellant's contention that this argument amounted to a "conclusion that Appellant *deserved* that result, and the victim, her family, and all victims *deserved* that result" is without merit.

Appellant's ground of error is overruled.

The judgment is affirmed.

CLINTON and TEAGUE, JJ., dissent.