Opinion issued June 16, 2005


















In The
Court of Appeals
For The
First District of Texas




NO. 01-04-00782-CR
____________

DEION DEWAYNE SERGENT, Appellant

V.

THE STATE OF TEXAS, Appellee
 

 
 
On Appeal from the 209th District Court
Harris County, Texas
Trial Court Cause No. 971579
 

 
 
MEMORANDUM OPINION
             A jury found appellant, Deion Dewayne Sergent, guilty of the offense of
murder


 and assessed his punishment at confinement for 40 years. In two points of
error, appellant contends that the evidence was factually insufficient to support his
conviction. We affirm. 
Factual Background
          Dorothy Frelow, a friend of the complainant’s, testified that, in October or
November of 2002, the complainant introduced appellant to Frelow as the father of
the complainant’s then-unborn baby, Deirdra, who was born on December 8, 2002. 
On the evening of March 20, 2003, Frelow, the complainant, and two of their friends,
Patricia Orji and “Peaches,” went to Metropolis, a club, to celebrate another friend’s
birthday. After spending two hours at the club, Frelow and the complainant returned
to the complainant’s one-bedroom apartment, where the complainant lived with her
baby and her mother, who were asleep in the dining room. Frelow spent the night,
sleeping on an air mattress bed in the complainant’s bedroom. 
          Frelow further testified that, the next morning, on March 21, 2003, at about
9:00 a.m., she awoke to the sound of Deirdra crying. Frelow also heard appellant and
the complainant arguing in the bathroom, which was accessible only through the
bedroom. Frelow walked into the living room to tend to Deirdra. Appellant came out
of the bedroom, nodded to Frelow, walked quickly to Deirdra in her bassinet, kissed
her, and then left the apartment. After appellant left, Frelow went into the
complainant’s bedroom to get her glasses and then knocked on the bathroom door,
which was closed, to check on the complainant. After receiving no response, Frelow
tried to open the door but discovered that it was locked. Frelow explained that,
although she was concerned, she thought that the complainant just wanted to be
alone. The complainant’s mother also received no response from the complainant
when she knocked on the bathroom door. After Frelow called Orji to ask her to come
to the complainant’s apartment, Orji arrived, knocked on the bathroom door, and also
received no response. Frelow and Orji eventually opened the bathroom door with a
screwdriver. Frelow saw the complainant lying in the bathtub, her head leaning to the
side toward the faucet, and blood dripping down the right side of her face. After a
call for emergency assistance was made, an ambulance and law enforcement officers
arrived. 
          Orji testified that the complainant and appellant occasionally argued and that
appellant had no participation in Deirdra’s life after she was born. On the evening
of March 20, 2003, while at the club, Orji received a call on her cellular telephone
from appellant, who asked about the complainant. After Orji told him that the
complainant was at a club, he became upset and hung up. At around 2:00 a.m., the
four girls left the club, and, after dropping Peaches off at her house, Frelow, Orji, and
the complainant returned to the complainant’s apartment. At around 3:00 a.m., Orji
left to stay at another friend’s house. The next morning, on March 21, 2003, at
around 9:30 a.m., after receiving a telephone call from Frelow, Orji went to the
complainant’s apartment, helped open the bathroom door, and saw the complainant
lying in the bathtub. After emergency assistance and law enforcement officers
arrived, Orji answered Frelow’s cellular telephone, and appellant, who was at the
other end, asked to speak with the complainant. Orji told him that the complainant
was busy but that he should come to the complainant’s apartment because someone
wanted to speak with him. Orji then handed the telephone to a police officer, who
spoke with appellant. About fifteen minutes later, appellant called Frelow’s cellular
telephone again, and she again gave the telephone to the police officer. 
          Houston Police Officer R. Lewis testified that, on March 21, 2003, after being
dispatched to the complainant’s apartment, he saw that paramedics were performing
CPR on the complainant, who had blood in her hair and who was lying on the
bedroom floor just outside of the bathroom. About five minutes later, after the
paramedics pronounced that the complainant was dead, Lewis contacted the homicide
division and secured the scene. Thereafter, one of the witnesses handed him a
cellular telephone, and the person on the other end identified himself as appellant,
who said that he “was down the street.” Lewis asked appellant to come to the
apartment, and appellant said that he would come. However, in the two to three hours
that Lewis was at the scene, appellant never came to the apartment. 
          Houston Police Sergeant J. Swaim, a homicide division detective, testified that,
on May 21, 2003, after arriving at the scene at about 10:05 a.m., he spoke with
Frelow, the complainant’s mother, and Orji in the apartment complex’s laundry room,
and the witnesses gave him appellant’s picture. The next morning, on March 22,
2003, he and his partner went to appellant’s apartment but were then taken to the
apartment of appellant’s grandmother in the same complex, where Swaim found
appellant hiding behind a bedroom door. 
          Harris County Assistant Medical Examiner Dr. A. Lopez testified that she
supervised Dr. Lester in conducting the complainant’s autopsy. Lopez observed that
the complainant had a gunshot wound on the left side of her head and that the bullet
entered the left side of the complainant’s head but did not exit her head. She also did
not detect any soot or gunpowder stippling around the gunshot wound. She explained
that, depending upon the type of firearm used, if a firearm’s barrel is greater than two-and-one-half to three feet away from the skin when fired, it will not deposit any soot
or stippling. She also saw that the complainant had a contusion below her right
eyebrow and a small laceration on her inner lip. In her opinion, the complainant’s
cause of death was a “penetrating gunshot wound to the head.” During cross-examination, Lopez agreed that it was “possible, but not probable” that a small-caliber firearm had been 18 inches from the complainant when fired and had not
deposited soot and stippling. She also agreed that it was possible that the
complainant’s wound could have been “caused by two people grappling over a gun
and it firing accidentally.”
          Houston Police Department firearms examiner D. Stein testified that the bullet
that was recovered from the complainant was “consistent in size, style and weight
with that loaded in a .25 auto cartridge” and that the bullet had been fired from a
handgun. During cross-examination, he agreed that, “if one or two people had their
hands on the gun and it fired, that the slide might be kept from going back and
chambering another round.” He also testified that since he had “never personally
done any testing” or “read specifically about .25 autos,” he could not state that a .25
caliber firearm might not deposit soot and stippling from a distance of 18 to 24 inches
away from a gunshot wound. During redirect examination, he testified that he was
not able to calculate the distance from the firearm to the gunshot wound because no
firearm or ammunition was submitted to him for comparison. 
          Houston Police Officer J. Wood, assigned to the Crime Scene Unit, testified
that, on March 21, 2003, he secured the scene after being dispatched to the
complainant’s apartment. He saw a bloodstain pattern on the bathroom’s south wall,
which was opposite of the bathtub’s faucet, both above and below the towel bar. He
explained that he had received training in evaluating blood spatter evidence. He
testified that the blood stain above the towel rack, which was five feet, three inches
from the floor, had “characteristics of having a perpendicular or 90 degree impact
angle on the wall, meaning that, when it left the source, it flew at a 90 degree angle
and struck the surface” and that it would be characterized as “high velocity.” The
bloodstain below the towel rack, which was three feet, ten inches from the floor, was
indicative of blood striking the wall “not at a ninety degree angle” but “more of a
greater angle of impact where the blood was actually in a downward trajectory when
it struck the wall.” In his opinion, “the blood spatter on the wall [was] consistent with
the [c]omplainant standing with her left side toward the wall [o]n which the blood
was found” and that “the blood spatter was indicative of back spatter, meaning when
the bullet entered the complainant’s head, it forced blood back out of the wound,
impacting the wall at a 90 degree or perpendicular angle, consistent with her height
and body position.” During cross-examination, he agreed that it was possible, but
“highly unlikely,” that the back spatter from the gunshot wound could have arced in
an upward path, reached its peak, and then struck the wall exactly at that peak before
starting its downward trajectory. 
          Appellant testified that, some time in 2002, after being robbed at gunpoint at
his apartment complex, he bought a Lorsen .25 caliber automatic firearm from an
unidentified man whom he had met while getting off of a bus near the Astrodome. 
The night before the complainant was shot, on March 20, 2003, appellant went to the
complainant’s apartment, but only the complainant’s mother and Deirdra were there. 
He talked with the complainant’s mother, who said that the baby needed more
diapers. He tried to buy some diapers that night, but all the stores were closed. The
next morning, on March 21, 2003, at around 9:00 a.m., he returned to the
complainant’s apartment and again spoke with the complainant’s mother and gave her
some money. He then played with, held, and kissed his daughter. Thereafter, Frelow
and the complainant awakened. He spoke with Frelow, who came over and took the
baby from him, and appellant went into the bedroom to speak with the complainant
about some financial problems and the baby. A little while later, for more privacy, at
the complainant’s suggestion, they went into the bathroom. The complainant started
“pushing and pulling” appellant, and appellant’s .25 caliber automatic firearm, which
was in his pant’s pocket and which had a bullet in the chamber, fell to the floor. He
explained that not much pressure was needed to move the safety on the gun. The
complainant and appellant then started “tussling over the gun,” and appellant,
bending over, grabbed the bottom of the gun, and the complainant grabbed the top of
the gun, which was pointed upward. The gun went off, but he did not know whose
finger was on the trigger. He saw the complainant fall backward into the bathtub, saw
blood, and, because he was scared and in shock, left the complainant’s apartment and
drove to his grandmother’s apartment, where he spent the night. While driving to his
grandmother’s apartment, he threw the gun out the window. He did not recall how
the bathroom door became shut and locked after he left. He explained that he called
the complainant’s apartment to see if she was all right and that he did not call for
emergency assistance or law enforcement because he was scared and ashamed. 
          During cross-examination, appellant indicated that, when the gun was fired, it
was about three feet from the floor and that the complainant had her hand wrapped
around the gun’s barrel. He also testified that, when he left the complainant’s
apartment after she had been shot, he told Frelow to call for emergency assistance. 
He agreed that his cousin, James Rosenthal, was waiting for him in the car after
appellant left the complainant’s apartment and that he told Rosenthal that “the gun
had went off and [that he] thought something was wrong.” During redirect
examination, appellant explained that he helped police officers search the street where
he thought that he had thrown the gun out his car window, but they were unable to
locate it. He also indicated that he did not remember the position of the gun when it
was fired because it had been so long since the occurrence. 
          In the State’s rebuttal case, Dr. E. Sappenfield, a trace evidence lab manager
with the Harris County Medical Examiner’s Office, testified that he analyzed the
complainant’s left palm to determine if gunshot residue was present. In his opinion, 
the results were inconclusive as to the presence of gunshot residue on the
complainant’s palm, meaning that there was not enough barium, antimony, and lead
present to yield a positive result. He also explained that semiautomatic weapons tend
to give off less gunshot residue than bigger firearms, such as revolvers. He further
testified that, if a person had her left hand wrapped around the barrel of a .25 caliber
semiautomatic when it was fired, he would expect to find gunshot residue on the back
of the hand. During cross-examination, he agreed that, if a person were holding her
left palm over the slide as a gun was fired, residue from the ejection port might get
on her palm. On redirect examination, he also explained that any gunshot residue on
a person’s palm could also be consistent with a person putting her hand up in a
defensive posture when a gun is fired at her.
Sufficiency of the Evidence
          In his two points of error, appellant argues that the evidence was factually
insufficient to prove that appellant “intended to cause” the complainant’s death or
that he “intended to cause serious bodily injury” to the complainant because “the
proof that [a]ppellant intended to kill [the complainant] or intended to cause serious
bodily injury is so obviously weak as to undermine confidence in the jury’s
determination” of appellant’s guilt.
            In our review of the factual sufficiency of the evidence, we view all of the
evidence neutrally, not in the light most favorable to the verdict, and we will set aside
the verdict “only if the evidence is so weak that the verdict is clearly wrong and
manifestly unjust, or the contrary evidence is so strong that the standard of proof
beyond a reasonable doubt could not have been met.” Escamilla v. State, 143 S.W.3d
814, 817 (Tex. Crim. App. 2004) (citing Zuniga v. State, 144 S.W.3d 477, 483 (Tex.
Crim. App. 2004)); see Johnson v. State, 23 S.W.3d 1, 6-7 (Tex. Crim. App. 2000). 
Although our analysis considers all the evidence presented at trial, we note that the
trier of fact is the exclusive judge of the facts, the credibility of the witnesses, and the
weight to be given to their testimony. Johnson, 23 S.W.3d at 7; Jones v. State, 944
S.W.2d 642, 648 (Tex. Crim. App. 1996). Unless the available record clearly reveals
that a different result is appropriate, an appellate court must defer to the jury’s
determination concerning what weight to give contradictory testimonial evidence
because this resolution often turns on an evaluation of the credibility and demeanor
of the witnesses, and the jurors were in attendance when the testimony was delivered. 
Johnson, 23 S.W.3d at 8.
            A person commits the offense of murder if he (1) intentionally or knowingly
causes the death of an individual or (2) intends to cause serious bodily injury and
commits an act clearly dangerous to human life that causes the death of an individual.
Tex. Pen. Code Ann. § 19.02(b)(1)–(2) (Vernon 2003). In the instant cause,
appellant was charged, and the jury was instructed, on both theories. In response to
the charge, the jury returned a general verdict of guilty. When the trial court submits
alternative theories of conviction to the jury, and the jury returns a general verdict,
we will uphold the verdict if the evidence is sufficient to support any of the
alternative theories. Aguirre v. State, 732 S.W.2d 320, 326 (Tex. Crim. App. 1987)
(op. on reh’g). 
          A defendant’s intent may be inferred from his acts, words, and conduct. 
Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); Beltran v. State, 593
S.W.2d 688, 689 (Tex. Crim. App. 1980). Proof of a mental state, such as intent,
must almost always be proved by circumstantial evidence. Smith v. State, 56 S.W.3d
739, 745 (Tex. App.—Houston [14th Dist.] 2001, pet. ref’d). The jury may infer the
intent to kill from the use of a deadly weapon unless it would not be reasonable to
infer that death or serious bodily injury could result from the use of the weapon. 
Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996); Ross v. State, 861
S.W.2d 870, 873 (Tex. Crim. App. 1992); Dominguez v. State, 125 S.W.3d 755, 761
(Tex. App.—Houston [1st Dist.] 2003, pet. ref’d).
          Appellant argues the evidence in the instant cause was factually insufficient to
support the jury’s implied findings that appellant intended to cause the complainant’s
death or that he intended to cause serious bodily injury to the complainant because
(1) “[t]he State proved no motive for [the complainant’s] murder”; (2) “neither
Officer Wood’s [n]or Dr. Sappenfield’s testimony conclusively disproved
[a]ppellant’s version of the facts”; (3) “[t]o the contrary, Officer Wood stated [that]
the blood spatter pattern possibly was caused by blood striking the wall by arching
upward from a point below it’s [sic] striking point of 5'3" inches [sic] above the
floor”; and (4) “Dr. Sappenfield’s testimony established that all three elements of
barium, antimony and lead which are components of primers used in most
ammunition were found on the left palm of [the complainant].”
          Here, however, there is ample evidence that appellant either intended to kill the
complainant or intended to cause serious bodily injury and committed an act clearly
dangerous to human life that resulted in the complainant’s death. Dorothy Frelow
testified that she heard appellant and the complainant arguing in the complainant’s
bathroom. Frelow then saw appellant quickly leave the apartment soon thereafter. 
Both Frelow and Patricia Orji testified that the bathroom door was locked and that
they had to open the door with a screwdriver. They testified that they found the
complainant lying in the bathtub, with her head propped against the faucet and blood
running down her face. Dr. Lopez, an assistant medical examiner, testified that she
did not detect any soot or stippling around the gunshot wound on the complainant’s
head, and Lopez explained that, if a gun’s barrel is fired from a distance of greater
than two-and-one-half to three feet away from a target, no soot or stippling would be
deposited. Lopez also testified that she saw that the complainant had a contusion
below her right eyebrow and a small laceration on her inner lip. Darrell Stein, a
firearms expert, testified that the bullet recovered from the complainant was
“consistent in size, style and weight with that loaded in a .25 auto cartridge.” Officer
Wood, who was trained in evaluating blood spatter evidence, testified that the blood
spatter on the bathroom wall was consistent with the complainant standing with her
left side toward the wall when she was shot. Wood also explained that the blood
spatter was indicative of back spatter, meaning that, consistent with the complainant’s
height and body position, after the complainant was shot in the left side of her head,
blood was forced out of the wound, left the wound at a 90 degree angle, and struck
the wall. Dr. Sappenfield, a trace evidence lab manager, testified that gunshot residue
was not conclusively detected on the complainant’s left palm. He also testified that
he would expect to find gunshot residue on the back of a hand that was wrapped
around the barrel of a fired gun and that any gunshot residue on a person’s palm could
also be consistent with a person putting her hand up in a defensive posture when a
gun is fired at her.
          Furthermore, appellant testified that he had a Lorsen .25 caliber semiautomatic
firearm in his pocket when he went to the complainant’s apartment the morning that
she was shot. He also testified that he and the complainant got into an argument
about finances and their baby while in the bathroom, that they were pushing one
another, and that they were “tussling over the gun” that had fallen out of his pocket. 
As stated above, intent to kill or cause serious bodily injury that resulted in death may
be inferred from appellant’s acts, words, and conduct. Guevara, 152 S.W.3d at 50;
Beltran, 593 S.W.2d at 689. Evidence that a defendant arrived at the scene of the
crime carrying a loaded weapon is probative of deliberate conduct. See Carter v.
State, 717 S.W.2d 60, 67 (Tex. Crim. App. 1986). Further, evidence of a struggle
does not necessarily negate deliberate conduct. See Turner v. State, 805 S.W.2d 423,
428 (Tex. Crim. App. 1991). Moreover, the jury was entitled to infer intent to kill
from appellant’s use of a deadly weapon. See Jones, 944 S.W.2d at 647. 
          Finally, motive is not a required element in a criminal case and need not be
proved to sustain a conviction. Bush v. State, 628 S.W.2d 441, 444 (Tex. Crim. App.
1982). The State was not required to prove that appellant had a motive to
intentionally kill the complainant or to cause serious bodily injury that resulted in the
complainant’s death. See id. Nevertheless, the evidence shows that appellant and the
complainant argued, which provides a motive.
          Considering this evidence, as the exclusive judges of the facts, the credibility
of the witnesses, and the weight to be given their testimony, the jury was free to
believe or disbelieve all or any part of the State’s witnesses’ or appellant’s testimony. 
McKinny v. State, 76 S.W.3d 463, 468-69 (Tex. App.—Houston [1st Dist.] 2002, no
pet.). As noted above, the jury, as the fact finder, is the sole judge of the weight and
credibility given to witness testimony, and, when reviewing the evidence, we must
not substitute our judgment for that of the fact finder. Johnson, 23 S.W.3d at 7. 
Viewing all of this evidence neutrally, we conclude that the evidence was not so weak
that the verdict was clearly wrong or manifestly unjust and that the contrary evidence
was not so strong that the standard of proof beyond a reasonable doubt could not have
been met. Accordingly, we hold that the evidence was factually sufficient to support
appellant’s conviction for the offense of murder.
          We overrule appellant’s two points of error.
 
 
 
 
 
Conclusion
          We affirm the judgment of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice
 
Panel consists of Chief Justice Radack and Justices Jennings and Hanks.
Do not publish. Tex. R. App. P. 47.2(b).