**Damarkice Demond STEPHERSON,
Appellant**

v.

**The STATE of Texas, Appellee**

NO. 14–15–00722–CR

Court of Appeals of Texas,
Houston (14th Dist.).

Opinion filed February 28, 2017

Molly Wurzer, Houston, TX, for The State of Texas.

Randall J. Ayers, Houston, TX, for Appellant.

Panel consists of Justices Jamison, Wise, and Jewell.

## OPINION

Martha Hill Jamison, Justice

A jury convicted appellant Demarkice Demond Stepherson of manslaughter and further determined that he used a deadly weapon in committing the offense. The trial court sentenced appellant to fifteen years in prison. In two issues, appellant challenges the sufficiency of the evidence to support both his conviction and the deadly weapon finding. Concluding that the evidence was sufficient to establish appellant's guilt and that he used his hands as a deadly weapon, we affirm.

### Background

Appellant was charged with causing the death of his cousin Stanley Rice by striking him with his hands. At trial, several eyewitnesses testified to an altercation between the two men occurring on February 9, 2014. At that time, appellant lived at his great-grandmother's house along with at least two younger cousins, K.L. and T.L., and K.L.'s mother, Brittany Paley. Rice had previously lived in the home, but apparently had been told not to return. On the day in question, Rice's former girlfriend, Sheila Cunningham, drove him to the house to retrieve some of his possessions. When they arrived, Rice opened the garage door to collect his items.

K.L. testified that from inside the house, he heard the garage door rise and went to look out a window. K.L. talked briefly to Rice through the window and then went to tell Paley, who was also in the house, that Rice was outside. According to K.L., appellant overheard this and immediately put on his shoes and went outside. When K.L. followed appellant outside, he saw appellant jump at Rice and strike him twice in the face with his fist. The blows caused Rice to fall to the ground, and appellant then got on top of Rice and continued to strike Rice in the head and body with his fists. K.L. attempted unsuccessfully to pull appellant off of Rice. K.L warned appellant that the police were on the way, and appellant responded, "I'm not getting up till the police come." Eventually, Paley pulled appellant off of Rice by the neck, and Rice got up and walked away. According to K.L., Rice had a busted lip, a cut under his eye, and was bleeding from his nose.

T.L. testified that when he came outside after hearing screaming, he saw appellant on top of Rice, striking Rice in the head with his fists. Appellant said, "Why are you talking about my grandma? She['s] in the hospital sick."

Paley was called to testify by the defense. She stated that she told Rice to leave, but he said he needed to "get some clothes or something." She then attempted to call her aunt about the situation when Rice and appellant began fighting. She said that appellant "jumped" Rice, but she did not actually see who threw the first punch. She insisted, however, that they were hitting each other and that it was not just appellant hitting Rice. She yelled at them both to stop and eventually broke up the fight, grabbing appellant and pulling him off of Rice.

Cunningham testified that after she and Rice arrived at the house, appellant came out of the house and confronted Rice before striking Rice with his fists. When Rice fell, appellant got on top of Rice and continued striking Rice with his fists, mostly on the head and face. Cunningham heard appellant say, "You were talking about my granny." Cunningham screamed for appellant to stop and told him she had called the police. When Rice finally got up, he and Cunningham left the property. Rice said he was afraid and wanted to leave. According to Cunningham, Rice had a busted lip, a swollen eye, and several cuts and bruises, and he appeared to be in pain and very upset. They waited a short distance away for the police to arrive. After speaking to the police, Cunningham drove Rice to a friend's house. She and the friend urged Rice to go to the hospital, but he refused, saying that he already had a doctor's appointment scheduled for the next day.

Officer Duy Nguyen of the Houston Police Department testified that when he met with Rice and Cunningham, Rice appeared to have fresh wounds, including a bruised eye that had blood in it and a swollen lip. There was blood on Rice's face and sweater, and Rice was holding a rag to his head to stop the bleeding. Nguyen offered to call an ambulance, but Rice refused the

offer. Photographs of Rice that Nguyen took that day were introduced into evidence.

Major Wright testified that Cunningham brought Rice back to his residence after the altercation. Rice would not eat anything and just wanted to sleep. The following day, Wright checked on Rice around noon, and he appeared to be doing better. However, when Wright came back around 3:00 p.m., Rice was lying on the floor. His body was cold, but Wright said that at first he detected a faint pulse. But, when Wright checked a second time, he detected no pulse, so he called an ambulance. Rice was pronounced dead at the scene.

HPD Officers Heidi Dougherty and Juan Ramos testified that they transported appellant to the Homicide Division's headquarters. As they were walking him to their patrol vehicle, appellant said, "Y'all act like I murdered [him]." Appellant also said, "He talked about my grandma, so I whooped his ass."

Appellant's videotaped statement was also played for the jury. In the statement, appellant confirmed much of the other witnesses' descriptions of the altercation, including that he hit Rice twice, knocking him to the ground, and then got on top of him and continued to hit him after he fell. Appellant stated that he felt Rice "was trespassing at my house," and "if someone raise[s] your garage up, pow, you can shoot them because that's on your property." Appellant further explained that the "whole family" was mad at Rice because he had failed to pay rent when he lived at the grandmother's house. Appellant was mad at Rice, so he didn't stop hitting Rice even with others trying to pull him off. He also insisted that Rice was trying to throw him off or "flip" him, so he kept hitting Rice. He said that he thought he would beat Rice, and Rice would leave and not come back. Appellant asserted that if not pulled off of Rice, he would have eventually stopped hitting him because appellant has his whole life ahead of him. "I graduated in June. I want to be a police officer, so I'm trying to keep everything straight."

Dr. Morna Gonsolin, an Assistant Medical Examiner at the Harris County Institute of Forensic Sciences, performed an autopsy on Rice. She determined that the cause of death was a subdural and subarachnoid hemorrhage due to blunt force head injuries and ruled his death a homicide. Gonsolin opined that a blow to the left side of the head was consistent with the injury that caused the fatal hemorrhage. She did not believe it was caused by a fall. Gonsolin further explained that the type of injuries sustained by Rice could bleed slowly, causing disorientation, headaches, drowsiness, and a gradual decline in the patient's level of consciousness and functioning. Gonsolin stated that, in her expert medical opinion, a person's hands can be used as a deadly weapon and that striking somebody with one's hands can be an act clearly dangerous to human life.

Although appellant was charged with murder, the jury found him guilty only of the lesser included offense of manslaughter. The jury also found that he used a deadly weapon, namely his hands, in committing the offense. The trial court thereafter sentenced appellant to fifteen years in prison.

## Standard of Review

The legal-sufficiency standard is the only standard that we apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). In reviewing the sufficiency of the evidence,

we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational factfinder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011).

We do not sit as a thirteenth juror and may not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, we defer to the factfinder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts. *Id.* Circumstantial evidence is as probative as direct evidence in establishing guilt, and indeed, circumstantial evidence alone can be sufficient. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative effect of all incriminating facts is sufficient to support the conviction. *Id.* As judge of the credibility of the witnesses, a jury may choose to believe all, some, or none of the testimony presented. *Cain v. State*, 958 S.W.2d 404, 407 n.5 (Tex. Crim. App. 1997). A jury is also entitled to resolve any inconsistencies in the evidence. *See Isassi*, 330 S.W.3d at 638.

### Sufficiency of the Evidence on Guilt

In his first issue, appellant challenges the sufficiency of the evidence to support the jury's finding that he committed manslaughter. A person commits manslaughter if he recklessly causes the death of an individual. Tex. Penal Code § 19.04(a). Because manslaughter is a result-oriented offense, the definition of the culpable mental state relates to the result of the conduct, i.e., the causing of a death.

*See Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003); *Perez v. State*, 216 S.W.3d 855, 857 (Tex. App.–Corpus Christi 2006, pet. ref'd). A person acts recklessly with respect to the result of his conduct when he is aware of, but consciously disregards, a substantial and unjustifiable risk that the result will occur. Tex. Penal Code § 6.03(c). The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all circumstances as viewed from the actor's standpoint. *Id.*; *Garza v. State*, 50 S.W.3d 559, 564 (Tex. App.–Houston [1st Dist.] 2001, no pet.). The reckless person neither desires for the risk occur nor is he reasonably certain that it will occur, but he does perceive it. *Dillon v. State*, 574 S.W.2d 92, 96 (Tex. Crim. App. 1978). Proof of a culpable mental state almost invariably depends upon circumstantial evidence and may be inferred from any facts tending to prove its existence, including the acts, words, and conduct of the accused. *Gant v. State*, 278 S.W.3d 836, 839 (Tex. App.–Houston [14th Dist.] 2009, no pet.).

Appellant asserts that the State failed to present evidence from which a rational juror could infer that he was aware of but consciously disregarded a substantial and unjustifiable risk of death in his altercation with Rice. He highlights the evidence that Rice stood up and walked away after appellant was pulled off of him and that appellant himself later said to police officers: "Y'all act like I murdered [him] .... He talked about my grandma, so I whooped his ass." Appellant suggests that while the evidence may have indicated he intended to and did fight appellant, it also indicates he had no awareness of and therefore no indifference towards a risk of death.

The evidence presented by the State, however, reasonably could have been interpreted by the jury as proof of an unrelenting attack that was administered with considerable force. As detailed above, multiple witnesses described yelling at appellant to stop and physically trying to make him stop well before he did, and then only when someone was finally able to pull him off of Rice. Even though Rice was able to walk away under his own power, witnesses, most notably the medical examiner, described significant injuries to Rice's face and head. Viewing the evidence in the light most favorable to the verdict and based on the evidence regarding the nature of the attack, the jury reasonably could have concluded that appellant was aware of and consciously disregarded a substantial and unjustifiable risk that Rice's death would be the result of the beating. *See* Tex. Penal Code § 6.03(c); *Schroeder*, 123 S.W.3d at 400; *see also Richardson v. State*, No. 04-12-00379-CR, 2013 WL 5653400, at *2 (Tex. App.–San Antonio Oct. 16, 2013, no pet.) (mem. op., not designated for publication) (affirming manslaughter conviction where evidence showed defendant struck victim twice in the face with a closed fist, knocking him to the ground); *Milam v. State*, No. 08-04-00354-CR, 2006 WL 304528, at *5 (Tex. App.–El Paso Feb. 9, 2006, pet. ref'd) (not designated for publication) (affirming manslaughter conviction where defendant struck victim on the side of the head with closed fist causing death). Even if appellant's post-attack statements could be interpreted as suggesting he was not aware of the danger, as appellant suggests, such statements must not be "plucked out of the record and examined in a vacuum." *Godsey v. State*, 719 S.W.2d 578, 584 (Tex. Crim. App. 1986); *Martinez v. State*, 16 S.W.3d 845, 847 (Tex. App.–Houston [1st Dist.] 2000, pet. ref'd).

Appellant additionally insists that the State sought only to prove that appellant acted intentionally and knowingly, as required for the charged offense of murder, and not recklessly, as required for manslaughter. Even if true, a jury is not prevented from looking at the same evidence and concluding that it supports a finding of reckless, and not intentional, conduct. *See Willis v. State*, 761 S.W.2d 434, 434 (Tex. App.–Houston [14th Dist.] 1988, pet. ref'd) (rejecting similar argument). In other words, the evidence in this case was not such that the jury could have rationally found only that appellant acted intentionally. *Cf. Ahrens v. State*, 43 S.W.3d 630, 635 (Tex. App.–Houston [1st Dist.] 2001, pet. ref'd) (holding defendant was not entitled to lesser included offense instruction on manslaughter where evidence demonstrated such an "uninterrupted barrage of unfathomable violence" that a rational jury could not have concluded was merely reckless and not intentional). Accordingly, we overrule appellant's first issue.

### Sufficiency of the Evidence on Deadly Weapon

In his second issue, appellant challenges the sufficiency of the evidence to support the jury's finding that he used a deadly weapon, namely his hands, in committing the offense. A deadly weapon is anything that in the manner of its use or intended use is capable of causing death or serious bodily injury. Tex. Penal Code § 1.07(a)(17)(B). Texas courts have consistently recognized that a hand may be a deadly weapon within the meaning of section 1.07(a)(17)(B), "depending upon the evidence shown." *Lane v. State*, 151 S.W.3d 188, 191 (Tex. Crim. App. 2004) (quoting *Turner v. State*, 664 S.W.2d 86, 90 (Tex. Crim. App. 1983)). When the State alleges the use of a deadly weapon—and the weapon in question is not a deadly weapon per se such as a firearm—it must prove beyond a reasonable doubt that the

weapon was used in a manner capable of causing death or serious bodily injury. *See Hill v. State*, 913 S.W.2d 581, 584 (Tex. Crim. App. 1996). Any injuries inflicted on the victim may be considered in determining whether a hand was used as a deadly weapon. *Lane*, 151 S.W.3d at 191; *Turner*, 664 S.W.2d at 89. Although expert testimony is not required for a deadly weapon finding, it may be useful to the factfinder. *See Davidson v. State*, 602 S.W.2d 272, 273 (Tex. Crim. App. [Panel Op.] 1980); *Magana v. State*, 230 S.W.3d 411, 416 (Tex. App.–San Antonio 2007, pet. ref'd).

 Appellant specifically asserts that the evidence presented here demonstrated that he did no more than what would have occurred in any typical misdemeanor assault case and appellant's use of his hands as a weapon only appeared deadly once Rice died after having refused medical attention. Appellant further insists that there was no evidence his use of his hands was excessive or that there was any size disparity between him and Rice. He further notes that Gonsolin, the medical examiner, acknowledged she could not tell exactly how the injuries were sustained.

Gonsolin, however, testified that a blow to the left side of Rice's head was consistent with the injury that caused the hemorrhage that led to his death. Moreover, as discussed above, the jury reasonably could have concluded, based on the evidence presented, that appellant conducted an unrelenting attack on Rice using considerable force. Appellant admitted to striking Rice in the head repeatedly, and multiple eyewitnesses confirmed that appellant continued to beat Rice even though bystanders were yelling for appellant to stop and even physically attempting to get appellant off of Rice. Gonsolin's testimony substantiated the injuries sustained by Rice, the force necessary to inflict such injuries, and that the manner and use of one's hands could cause serious bodily injury or death. This evidence was sufficient to support the jury's deadly weapon finding. *See Lane*, 151 S.W.3d at 192 (affirming deadly weapon finding where evidence showed defendant punched victim several times in the head, knocking her to the floor and causing a concussion among other injuries and medical personnel testified that a punch to a person's head could cause serious injury); *Jefferson v. State*, 974 S.W.2d 887, 888 (Tex. App.–Austin 1998, no pet.) (affirming deadly weapon finding where evidence showed defendant struck the complainant several times in the face with his fist, causing the complainant to have blurred vision for several weeks and a broken nose and treating doctors testified that the act of hitting someone in the face could result in serious bodily injury or death). Accordingly, we overrule appellant's second issue.

We affirm the trial court's judgment.