ACCEPTED
05-16-01321-CR
FIFTH COURT OF APPEALS
DALLAS, TEXAS
1/30/2018 12:47 PM
LISA MATZ
CLERK

5th Court of Appeals
FILED: 01/31/2018
8:29:12
Lisa Matz, Clerk

*The State requests oral argument only if counsel for Appellant argues.*

## No. 05-16-01321-CR

# IN THE COURT OF APPEALS
# FOR THE FIFTH DISTRICT OF TEXAS
# AT DALLAS

RECEIVED IN
5th COURT OF APPEALS
DALLAS, TEXAS
1/30/2018 12:47:49 PM
LISA MATZ
Clerk

## MAURICE LAMAR PIPER,
*APPELLANT*

v.

## THE STATE OF TEXAS,
*APPELLEE*

*On appeal from the 283rd Judicial District Court of*
*Dallas County, Texas*
*in Cause No. F15-75812-T*

## STATE'S BRIEF

Faith Johnson
*Criminal District Attorney*
Dallas County, Texas

*Counsel of Record:*
Marisa Elmore
*Assistant District Attorney*
State Bar No. 24037304
Frank Crowley Courts Building
133 N. Riverfront Boulevard, LB-19
Dallas, Texas  75207-4399
(214) 653-3625
(214) 653-3643 *fax*
marisa.elmore@dallascounty.org

*Attorneys for the State of Texas*

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ..................................................................................iii

STATEMENT OF THE CASE.................................................................. 1

STATEMENT OF FACTS .......................................................................... 1

SUMMARY OF ARGUMENT ................................................................. 10

ARGUMENT ............................................................................................ 11

    **RESPONSE TO APPELLANT'S FIRST AND SECOND POINTS OF ERROR: The record does not support Appellant's claims that trial counsel provided ineffective assistance at trial, or that he was prejudiced by any deficient performance.** ......... 11

    **RESPONSE TO APPELLANT'S THIRD POINT OF ERROR: The Court should modify the judgment to correctly reflect that the jury convicted Appellant of manslaughter.** ........................ 31

PRAYER .................................................................................................... 32

CERTIFICATE OF WORD COMPLIANCE ............................................ 32

CERTIFICATE OF SERVICE ................................................................. 33

# INDEX OF AUTHORITIES

**Cases**

*Andrews v. State*,
 159 S.W.3d 98 (Tex. Crim. App. 2005).....................................................26

*Asberry v. State*,
 813 S.W.2d 526 (Tex. App.—Dallas 1991, pet. ref'd) ..........................31, 32

*Bigby v. State*,
 892 S.W.3d 864 (Tex. Crim. App. 1994)..............................................25, 29

*Bigley v. State*,
 865 S.W.2d 26 (Tex. Crim. App. 1993).................................................31, 32

*Bone v. State*,
 77 S.W.3d 828 (Tex. Crim. App. 2002)......................................... 16, 17, 18

*Brown v. State,*
 89 S.W.3d 630 (Tex. Crim. App. 2002)..................................................... 18

*Brown v. State,*
 955 S.W.2d 276 (Tex. Crim. App. 1997)................................................... 19

*Burruss v. State*,
 20 S.W.3d 179, 186 (Tex. App.—Texarkana 2000, pet. ref'd) ..............17, 27

*Carter v. State,*
 717 S.W.2d 60 (Tex. Crim. App. 1986).................................................... 28

*Dannhaus v. State*,
 928 S.W.2d 81 (Tex. App.—Houston [14th Dist.]
 1996, pet. ref'd)..............................................................20, 21, 25, 26

*Ex parte Martinez*,
 330 S.W.3d 891 (Tex. Crim. App. 2011)..............................................18, 27

*George v. State*,
 681 S.W.2d 43 (Tex. Crim. App. 1984).................................................... 19

*Hathorn v. State,*
  848 S.W.2d 101 (Tex. Crim. App. 1992) .................................................. 26

*Jackson v. State,*
  877 S.W.2d 768 (Tex. Crim. App. 1994) ....................................... 16, 21, 22

*Johnson v. State,*
  959 S.W.2d 230 (Tex. App.—Dallas 1997, no pet.) .................................. 27

*Lewis v. State,*
  529 S.W.2d 550 (Tex. Crim. App. 1975) ................................................. 20

*Lopez v. State,*
  343 S.W.3d 137 (Tex. Crim. App. 2011) ........................................... passim

*McFarland v. State,*
  928 S.W.2d 482 (Tex. Crim. App. 1996) ................................................. 16

*Menefield v. State,*
  363 S.W.3d 591 (Tex. Crim. App. 2012) ....................................... 16, 17, 22

*Mosley v. State,*
  983 S.W.2d 249 (Tex. Crim. App. 1998) ................................................. 16

*Okonkwo v. State,*
  398 S.W.3d 689 (Tex. Crim. App. 2013) .............................................16, 23

*Pouncy v. State,*
  No. 14-12-00470-CR, 2013 WL 3580638 (Tex. App.—Houston
  [14th Dist.] 2013, pet. ref'd) (mem. op., not designated for publication)..... 24

*Rogers v. State,*
  105 S.W.3d 630 (Tex. Crim. App. 2003) ................................................. 18

*Stepherson v. State,*
  523 S.W.3d 759 (Tex. App.—Houston [1st Dist.] 2017, no pet.). .............. 20

*Strickland v. Washington,*
  466 U.S. 668 (1984) ................................................................... passim

iv

*Thomas v. State*,
  699 S.W.2d 845 (Tex. Crim. App. 1985) .................................................. 28

*Thompson v. State*,
  9 S.W.3d 808 (Tex. Crim. App. 1999) .......................................... 18, 27, 30

*Tolbert v. State*,
  306 S.W.3d 776 (Tex. Crim. App. 2010) .................................................. 21

*Tong v. State,*
  25 S.W.3d 707 (Tex. Crim. App. 2000) .................................................... 18

*Vasquez v. State*,
  830 S.W.2d 948 (Tex. Crim. App. 1992) .................................................. 21

*Weeks v. State*,
  894 S.W.2d 390 (Tex. App.—Dallas 1994, no pet.) .................................. 27

*Whitehead v. State,*
  696 S.W.2d 221 (Tex. App.—San Antonio 1985, pet. ref'd) ...................... 19

## Statutes

Tex. Penal Code Ann. § 6.01 (West 2011) ................................................. 18
Tex. Penal Code Ann. § 6.03 (West 2011) ................................................. 20
Tex. Penal Code Ann. § 19.04 (West 2011) ..................................... 19, 31, 32

## Rule

Tex. R. App. P. 43.2 ............................................................................. 31

TO THE HONORABLE COURT OF APPEALS:

The State of Texas submits this brief in response to the brief of Appellant, Maurice Lamar Piper.

## STATEMENT OF THE CASE

The grand jury indicted Appellant for the murder of Hardy Wilson. (CR: 12). Appellant pled not guilty. (RR4: 11; CR: 48). A jury found him guilty of the lesser-included offense of manslaughter and sentenced him to eighteen years and six months' confinement in the Institutional Division of the Texas Department of Criminal Justice. (RR6: 104; CR: 48). Appellant filed a timely motion for new trial, which was overruled by operation of law, and a timely notice of appeal. (CR: 82-83).

## STATEMENT OF FACTS

Ronald Wadley owned New Image Collision (New Image), an auto body shop in Dallas. (RR4: 15, 17, 41-42, 45-49). Hardy Wilson, who was "like an uncle" to Appellant, owned another body shop across the street from New Image but occasionally worked at New Image. (RR4: 17-18, 50-51, 86; RR5: 56). On June 18, 2015, Appellant shot Wilson during an altercation at New Image. (RR4: 15, 17, 49; RR5: 56). The bullet went through Wilson's chest and exited his back, killing him. (RR4: 22-23).

The altercation arose from a dispute over Appellant's car, a Dodge Charger, which was at the shop for repairs. (RR5: 46, 88). Wadley testified that he had done some body work on the car, which Appellant told him had been involved in an accident. (RR5: 46, 88). An insurance company had disbursed some money for the repairs, with half of the money going to Wadley and the other half to Appellant. (RR4: 46). The Charger had been at the shop for eight or nine months because Appellant was behind on his car payments and it had a lien on it. (RR4: 47-40, 91).

Wadley testified that on the day of the shooting, Dominique Hawkins, Appellant's brother, called him about the Charger, which was still undergoing repairs. (RR4: 46-47, 51-54). At around five o'clock p.m., Wadley and his employee, Colvin Nickerson, were in the shop preparing to close for the day when Appellant and Hawkins entered the office. (RR4: 22-23, 43, 51-52, 166-68, 170-71). Wadley testified, "[Appellant] said he want flesh or he going to get some money today." (RR4: 53). Appellant had a gun in the pocket of his shorts; he took it out and held it during the exchange. (RR4: 55, 116). Wilson passed through the office a couple of times, and Appellant told Wadley in Wilson's presence, "[Wilson] know what I do. I'm a killer. I shoot him; I'm a killer and he know I shoot that gun." (RR4: 61-62).

Seeing the animosity Appellant had toward Wilson and to prevent anyone from being hurt, Wadley tried to de-escalate the situation by asking Appellant how much money he needed. (RR4: 53, 63). Appellant then started beating on the counter and stated, "I don't want no money. I want some flesh." (RR4: 63). Nickerson heard Appellant repeat those words three or four times. (RR4: 170-71, 181). Appellant told Wadley "it's the principle," and Wadley told him the principle was not worth someone's life and was not going to solve anything. (RR4: 63). Appellant responded, "I don't have nothing to lose." (RR4: 63). Appellant and Hawkins went outside. (RR4: 53, 64). At some point, Wilson also walked out of the shop and stood behind a truck that was backed in to a parking space between two other cars by the front door of the shop. (RR4: 66, 221, 224-25; SX 14).

Wadley, who witnessed the shooting from the window and front door of the body shop, testified that Appellant pulled the gun out and started a conversation with Wilson. (RR4: 123, 126-27). Appellant accused Wilson of "taking stuff" off his car. (RR4: 68). Appellant told Wilson, "You better not come close to me or I'm going to shoot you." (RR4: 68). Wilson did not charge at or rush toward Appellant. (RR4: 69). Wilson "threw his hands in the air," and Appellant shot him. (RR4: 68). Photographs of the crime scene depicted a chain link fence with a gate that bordered the parking lot of the

3

body shop. (SX 10-11). Wilson testified that when Appellant fired the shot, Hawkins was standing outside the gate a little over thirty feet away from Appellant. (RR4: 70-71, 123, 126). Wadley said the shooting was not an accident, but was "a killing." (RR4: 120-21).

Freddie Whitaker, an auto-glass installer who was outside during the shooting, also testified Appellant deliberately shot Wilson. (RR4: 199). Whitaker testified that Appellant and Hawkins started walking back toward the office. (RR4: 212). Hawkins, in an attempt to get Appellant to leave, grabbed Appellant by the arm; Appellant jerked away, and Hawkins exited the gate. (RR4: 212-14). Whitaker heard Appellant say to Wilson, "You need to stay out of my business. Go ahead and say something, you always saying something." (RR4: 214). Appellant pulled a weapon out and said, "Nigger, I shoot you." (RR4: 214, 217, 230). Wilson put his hands up and Appellant shot him. (RR4: 214, 216-17). Whitaker testified as follows:

[THE STATE]: Was it a mistake?

[WHITAKER]: No, it wasn't a mistake, [Appellant] just told him he was going to shoot him and he shot him.

[THE STATE]: He said it and he shot him.

[WHITAKER]: Yes.

[THE STATE]: Was there anyone pulling his arm back where the gun would have gone off by mistake?

4

[WHITAKER]: No one was near him.

[THE STATE]: Was anyone touching him when the gun went off?

[WHITAKER]: No one was near him.

[THE STATE]: You said [Hawkins] was outside the fence over there; is that correct?

[WHITAKER]: [Hawkins] was outside the fence over here.

(RR4: 218-19).

Nickerson also testified that Appellant shot Wilson with no interference from Hawkins. (RR4: 189-90). Nickerson testified that Hawkins tried to stop Appellant from re-entering the office; about a thirty-second scuffle ensued, but Appellant broke away from Hawkins and did not fire the gun until two to three minutes later. (RR4: 186-90). Nickerson heard Wilson say, "I didn't take anything off the car." (RR4: 196). Appellant then said to Wilson, "Don't walk toward me," and shot him. (RR4: 196).

Ladon McKinney also was standing outside the body shop near the gate and witnessed the shooting; he gave a recorded statement to police at the crime scene. (RR5: 38-39, 42; SX 31). McKinney, who was in jail at the time of trial, refused to testify at trial and was deemed a "hostile witness." (RR5: 37-38, 41-42). He claimed he did not remember what happened that day because he was high on marijuana. (RR5: 39).

The State played the recording of McKinney's crime-scene statement for the jury. (RR5: 42). McKinney told the police that Appellant was "aggressive" toward Wilson "from the beginning to the end." (SX 31). McKinney said he saw Appellant pull out a black .38 or .32 revolver and point it at Wilson, and heard him tell Wilson if he walked or moved "he was going to pop him." (SX 31). McKinney said Wilson threw his hands up, and "the next thing I know he pops him." (SX 31). McKinney stated that Hawkins, "was the one trying to stop everything … he was the one who pulled the dude back. He coulda did more, but he just grabbed him and tried to stop everything." (SX 31).

Appellant testified to a different version of facts leading up to the altercation and the shooting. He testified that Wadley and Wilson were complicit with him in facilitating insurance fraud involving Appellant's Charger, a car that Appellant wanted "to get rid of" because he owed more money on the car than it was worth. (RR5: 57-60). Appellant claimed the plan went awry, with Wadley keeping the insurance checks and taking parts off the car to fix other vehicles. (RR5: 64-65, 80). Wadley denied knowing about any insurance fraud involving the car. (RR4: 97-99).

Appellant testified that on the day of the shooting, frustrated because he did not believe Wadley was working on the car, he called Wadley and threatened to call the insurance company to report the fraud; in response,

6

Wadley told Appellant to come by the shop and get his money. (RR5: 67-68). Appellant claimed he did not feel safe going to the shop and suspected that Wadley's invitation to come get his money might have been "a setup," so he picked up Hawkins on the way. (RR5: 68-70). Appellant admitted that he never told police or the insurance agent that he believed the situation was a setup or that he was scared for his life. (RR5: 91, 93).

Appellant admitted that he took a loaded .38 revolver with him to the shop. (RR5: 69-70, 91, 93, 104). Appellant testified that he previously had purchased a gun from Wilson and that he had carried a gun in the past. (RR5: 69). He claimed, however, that he could not remember where he obtained that particular gun. (RR5: 69).

Appellant testified he was worried when he and Hawkins arrived and saw Wilson and "his crew" of four or five people in the driveway of the shop. (RR5: 70-71). He was afraid that they were going to attack him and Hawkins. (RR5: 72). Nevertheless, he entered the office and asked Wadley for his money and an update on the car repairs. (RR5: 72-73). Appellant was not satisfied with the answers Wadley provided. (RR5: 72-73). Appellant denied telling Wadley he was going to get "flesh or money," and claimed he instead told Wadley that since he could not get his money or his car he was going to call the police and the insurance company about the matter. (RR5: 74).

7

Appellant testified that he and Hawkins exited the shop; Wilson also came out and propped his foot on a truck and started "staring [Appellant] down," giving him "the google eye." (RR5: 76-77). When counsel asked Appellant if he believed Wilson had a gun, Appellant stated, "It was speculation. I mean, [Hawkins] had mentioned something but I didn't take it into consideration." (RR5: 87). Appellant, who believed his car was being "chopped up" for parts, told Wilson, "Hey, I know y'all been taking parts off my car," but Wilson denied doing so. (RR5: 77-80). Appellant accused him again, and Wilson "shot around the car taking long strides." (RR5: 80). He testified as follows:

> [APPELLANT]: So after he come up he end up in the middle, in the middle halfway from where I'm standing.
>
> [TRIAL COUNSEL]: Okay. Now where you're standing, who is next to you?
>
> [APPELLANT]: My brother is next to me.
>
> [TRIAL COUNSEL]: Okay. What happens next, Maurice?
>
> [APPELLANT]: I take my gun out and I draw down on him and I tell him don't approach me.
>
> [TRIAL COUNSEL]: Why did you do that, Maurice?
>
> [APPELLANT]: I was just – I was in fear, pretty much.
>
> [TRIAL COUNSEL]: Did you have any intention of shooting Hardy Wilson that day?

8

[APPELLANT]: No, not at all.

(RR5: 81). When he told Wilson not to approach him, Wilson "threw his hands up." (RR5: 83). Then the two men engaged in a "dialogue," talking back and forth. (RR5: 83).

Appellant testified that Wilson started taking steps backward with his hands in the air; he still had his gun drawn on Wilson. (RR5: 84). He claimed Hawkins was next to him on the left side, and "[f]or some strange reason, [Hawkins] grabbed my neck and shoulder area." (RR5: 82-85). The grabbing was a "sudden jerk" that he was not expecting; the gun went off and he was surprised. (RR5: 85). Appellant and his counsel demonstrated for the jury how Hawkins grabbed Appellant. (RR5: 85). Trial counsel asked Appellant, "If your brother had not pulled your arm would you have shot [Wilson]?" (RR5: 107). Appellant said he would not. (RR5: 107). The State asked Appellant if he had ever shot a .38 revolver before, and Appellant claimed that he had not. (RR5: 93). When the State asked, "It takes a lot of pressure to shoot a revolver over a handgun; isn't that right?" Appellant answered, "I don't know." (RR5: 93). The State also asked Appellant if he killed an unarmed man, and Appellant stated, "I don't – I don't know." (RR5: 105).

Appellant testified he had no intention of shooting Wilson and was "devastated" by Wilson's death. (RR5: 81-82, 87). When Appellant saw that

9

Wilson had been shot, he was "frozen," "shaken up," and in "disbelief." (RR5: 85-86). Appellant testified that he fled after the shooting because he was scared and wanted "to get away from the scene before anything else happened other than this misfortune." (RR5: 87).

Appellant admitted that and his girlfriend left the State of Texas and Hawkins helped him get rid of the gun. (RR5: 93-95, 104). Appellant returned to Texas only after he discovered that Hawkins had turned himself in to police. (RR5: 99). When he returned, he first called the auto insurance company, telling the insurance agent that he had lost his job and could not provide for his family. (RR5: 99). He told the insurance agent, "I did it or whatever. My brother turned himself in. He didn't do it. I killed him. I did." (RR5: 95, 99). Appellant did not turn himself in to police until six days after he shot Wilson. (RR5: 100).

### SUMMARY OF ARGUMENT

Appellant has failed to demonstrate that he received ineffective assistance of counsel. Appellant fails to fulfill the first prong of *Strickland* because the record does not contain affirmative evidence explaining trial counsel's decision not to request a voluntariness-of-conduct instruction in the jury charge. Moreover, a review of the record indicates that trial counsel employed objectively reasonable trial strategy in attempting to prove Appellant

10

did not have the culpable mental state for murder and encouraging the jury to either acquit Appellant or consider a conviction of manslaughter. Moreover, Appellant fails to prove the second prong of *Strickland* because the overwhelming evidence of Appellant's guilt, coupled with his self-serving, incredible testimony, shows that even had the jury charge included a voluntariness-of-conduct instruction, no reasonable probability exists that the jury would have acquitted him.

Finally, this Court should modify to the judgment to correctly reflect that the jury convicted Appellant of manslaughter, a second-degree felony under section 19.04 of the Texas Penal Code.

## ARGUMENT

### RESPONSE TO APPELLANT'S FIRST AND SECOND POINTS OF ERROR

**The record does not support Appellant's claims that trial counsel provided ineffective assistance at trial, or that he was prejudiced by any deficient performance.**

In his first issue, Appellant argues that because his testimony raised the issue of voluntariness of conduct, his trial counsel's failure to request a jury charge instruction on that issue amounted to ineffective assistance of counsel. In his related second issue, Appellant contends that trial counsel provided ineffective assistance of counsel by "inviting" the trial court to include an

11

instruction on the lesser-included offense of manslaughter in the jury charge. The record does not support Appellant's claims.

**Relevant Facts**

During voir dire, the State discussed manslaughter with the jury panel. (RR3: 34). Trial counsel also discussed manslaughter with the jury panel, including the applicable punishment range and the culpable mens rea of recklessness. (RR3: 87-88). Trial counsel also discussed criminally negligent homicide with the panel and extensively discussed self-defense. (RR3: 89-105).

At the October 24, 2016 pretrial hearing, trial counsel informed the trial court that he believed lesser-included offenses of manslaughter and criminally negligent homicide would be raised by the evidence at trial and that he would be filing a notice of eligibility for probation. (RR2: 11). At the time of trial, Hawkins had also been charged with the murder of Wilson; he was out of jail on bond, and the parties discussed whether he was going to testify at trial. (RR2: 9; RR5: 24). The State and trial counsel anticipated that he would testify, and Hawkins's counsel affirmed that he might do so. (RR2: 10). However, on October 27, after the State had rested and before trial counsel presented Appellant's case, Hawkins invoked his Fifth Amendment right to not testify. (RR2: 9-10; RR5: 23).

Trial counsel did not present an opening statement. (RR4: 13; RR5: 22-32). At closing, trial counsel argued that Appellant was reckless in pulling a gun out, as follows:

> Was [Appellant] right for coming over there with a gun? Okay, first point that needs to be made, no one has said that him coming over there with a gun is illegal. We have not heard one word of testimony. … Was it smart? No, it was stupid, it was stupid. Okay? It's set into a part of a chain of events that occurred. Now, many of these events were out of the control of [Appellant]. But it was a dumb thing to do. Chalk it up to a kid, a 29-year-old who just [sic] a stupid mistake. Was he upset? Yeah, he probably was upset.

(R5: 121). Trial counsel continued to argue that Wilson left the office "in a huff." (RR5: 124.) Trial counsel appeared to argue that Appellant pulled out a gun because he was afraid of Wilson and, due to the unexpected appearance of the employees from Wilson's shop, his action in doing so might have been reasonable behavior because he was in a "chop shop." (RR5: 123-24). Counsel argued:

> But what did you hear from [Appellant] is, he had no intention of using that weapon, none. He wanted to meet [Wilson] over there. You heard from many witnesses that [Wilson] advance at that time. And you heard – you heard testimony that at that time [Hawkins] grabbed [Appellant] and the gun went off.
>
> …
>
> And he told you that he is – feels horrible that it happened, and that is not a lie. But from all the evidence you know, he is not criminally responsible for this.

13

And if he did anything his act was reckless, pulling out the weapon itself. He is not responsible for that weapon pulling out, but if you're going to hold him [sic] for doing anything, it was a reckless act.

(RR5: 124-25). Trial counsel finally argued, "Folks, this was a horrible thing and [Appellant] is not coming to you with totally clean hands. He made that admission. But at the end of the day, he is not criminally liable for the offense of murder." (RR5: 125).

At the jury charge conference, trial counsel did not request a voluntariness-of-conduct instruction. (RR5: 108). Trial counsel requested a charge on criminally negligent homicide, which the trial court denied. (RR5: 108). Ultimately, the trial court's charge to the jury stated in pertinent part:

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

A person commits the offense of manslaughter if he recklessly causes the death of an individual.

(CR1: 61). The jury charge included the statutory definitions of "intentionally," "knowingly," and "recklessly." (CR1: 62). The jury charge included application paragraphs regarding knowing and intentional murder and serious bodily injury murder. (CR1: 65). The jury was instructed that if it did not believe Appellant committed murder, to next consider the following:

14

[I]f you believe from the evidence beyond a reasonable doubt that the defendant … did then and there recklessly cause the death of Hardy Wilson … by shooting deceased with a firearm, a deadly weapon, thereby causing the death of said deceased, you will find the defendant guilty of the offense of manslaughter, as included in the indictment.

If you find from the evidence beyond a reasonable doubt that the defendant is guilty of murder or manslaughter, but you have a reasonable doubt as to which offense he is guilty, then you must resolve that doubt in favor of the defendant and find him guilty of the lesser offense of manslaughter.

If you do not believe, or if you have a reasonable doubt that the defendant is guilty of any offense as contained in this charge, then you will find the defendant not guilty, and say by your verdict, not guilty.

(CR1: 66).

### **Standard of Review**

To prove a claim of ineffective assistance of counsel, an appellant must show that (1) his trial counsel's performance fell below an objective standard of reasonableness, and (2) a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). Under the first prong of the *Strickland* test, an appellant must show that counsel's performance was deficient. *See Strickland*, 466 U.S. at 687. This requires the appellant to demonstrate that counsel's representation fell below an objective standard of

reasonableness under prevailing professional norms. *See id.* at 688. To satisfy this requirement, the appellant must identify the acts or omissions of counsel alleged to constitute ineffective assistance and affirmatively prove that they fell below the professional norm for reasonableness. *See McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996), *abrogated on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998).

The reviewing court begins with a strong presumption that counsel was effective. *See Jackson v. State,* 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). The court should presume counsel's actions and decisions were reasonably professional and were motivated by sound trial strategy. *Id.*; *see also Okonkwo v. State*, 398 S.W.3d 689, 693 (Tex. Crim. App. 2013). The appellant must rebut this presumption by presenting evidence illustrating the reasons for counsel's actions and decisions. *See Jackson*, 877 S.W.2d at 771. The appellant cannot meet this burden if the record does not affirmatively support the claim. *See Menefield v. State,* 363 S.W.3d 591, 592 (Tex. Crim. App. 2012). When direct evidence is not available, reviewing courts will assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined. *Lopez,* 343 S.W.3d at 143.

An ineffective assistance claim cannot be built upon retrospective speculation. *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002).

Moreover, before being condemned as unprofessional and incompetent, counsel should be given an opportunity to explain his actions. *See id.* at 836. If trial counsel is not given that opportunity, then the appellate court should not find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it. *Menefield,* 363 S.W.3d at 592. More specifically, it must be apparent from the record "that counsel's performance fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning." *Lopez*, 343 S.W.3d at 143. Thus, absent a properly developed record, an ineffective assistance claim must usually be denied as speculative. *See Bone,* 77 S.W.3d at 836.

Under the second prong of *Strickland*, the appellant must affirmatively prove his counsel's deficient performance prejudiced his defense. *See Strickland*, 466 U.S. at 687; *Burruss v. State*, 20 S.W.3d 179, 186 (Tex. App.—Texarkana 2000, pet. ref'd). The appellant must prove that his counsel's error, judged by the totality of the representation and not by isolated instances of error, denied him a fair trial. *Burruss*, 20 S.W.3d at 186. It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding; instead the appellant must show that a reasonable probability exists that, but for his counsel's error, the outcome of the proceeding would have been different. *Id.*;

17

*see also Bone*, 77 S.W.3d at 836. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694.

Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). To prevail on his claim, the appellant must prove both prongs of the *Strickland* test by a preponderance of the evidence. *Tong v. State,* 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). The prongs need not be analyzed in a particular order, and an appellant's failure to satisfy either prong defeats the claim. *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011).

## Applicable Law

Section 6.01(a) of the Texas Penal Code provides that "a person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession." Tex. Penal Code Ann. § 6.01(a) (West 2011). Voluntariness within the meaning of section 6.01(a) refers only to one's own physical bodily movements. *Rogers v. State,* 105 S.W.3d 630, 638 (Tex. Crim. App. 2003); *Brown v. State,* 89 S.W.3d 630, 633 (Tex. Crim. App. 2002). If a physical movement is the nonvolitional result of someone else's act, is set in motion by some independent nonhuman force, is caused by a physical reflex or convulsion, or is the product of unconsciousness, hypnosis or other

nonvolitional impetus, that movement is not voluntary. *See Rogers,* 105 S.W.3d at 638.

If the issue of voluntariness of conduct is raised by the evidence, whether it is strong, feeble, unimpeached, or contradicted, the defendant is entitled to an instruction on that issue. *See Brown v. State,* 955 S.W.2d 276, 279–80 (Tex. Crim. App. 1997). Evidence does not raise voluntariness of conduct when the accused voluntarily engages in conduct that includes one or more voluntary acts that lead to the actual shooting. *George v. State*, 681 S.W.2d 43, 47 (Tex. Crim. App. 1984). However, when evidence of an independent event that could have precipitated the discharge of the bullet, such as the conduct of a third party, is presented, a trial court must give the instruction when requested. *See id.; Brown,* 955 S.W.2d at 277 (holding defendant entitled to voluntariness instruction where the testimony reflected the gun discharged when the defendant was bumped from behind); *Whitehead v. State,* 696 S.W.2d 221, 222 (Tex. App.—San Antonio 1985, pet. ref'd) (holding question of voluntariness raised where the evidence showed gun discharged when someone grabbed defendant from behind).

As charged here, the jury could have found Appellant guilty of manslaughter if it found he recklessly caused the death of Wilson by shooting him with a firearm. *See* Tex. Penal Code Ann. § 19.04(a) (West 2011). A

19

person acts recklessly with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of, but consciously disregards, a substantial and unjustifiable risk that the circumstances exist or the result will occur. *Id.* § 6.03(c) (West 2011). The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all circumstances as viewed from the actor's standpoint. *Id.* "At the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct." *Lewis v. State,* 529 S.W.2d 550, 553 (Tex. Crim. App. 1975). Proof of a culpable mental state almost invariably depends on circumstantial evidence and may be inferred from any facts tending to prove its existence, including the acts, words, and the conduct of the accused. *Stepherson v. State*, 523 S.W.3d 759, 763 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

Even if the evidence raises voluntariness of conduct, merely being entitled to a jury instruction but not requesting it is not the test for ineffective assistance of counsel. *See Dannhaus v. State*, 928 S.W.2d 81, 85-86 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd). A failure to request an instruction on voluntary conduct simply because the evidence raises the issue does not mean counsel was ineffective, as defensive issues "frequently depend upon trial strategy and tactics." *See Tolbert v. State*, 306 S.W.3d 776, 779–82 (Tex. Crim.

App. 2010); *see also Vasquez v. State*, 830 S.W.2d 948, 950 n.3 (Tex. Crim. App. 1992) ("[J]ust because a competent defense attorney recognizes that a particular defense might be available to a particular offense, he or she could also decide it would be inappropriate to propound such a defense in a given case."). Instead, the test is whether it was objectively unreasonable for counsel not to ask for it. *Dannhaus*, 928 S.W.2d at 85-86; *see Strickland,* 466 U.S. at 686. Counsel is under no duty to raise every defense available, so long as counsel presents a defense that is objectively reasonable or strategically sound. *Dannhaus,* 928 S.W.2d at 86 (holding where the evidence of the appellant's guilt was strong, trial counsel's action in not requesting instructions on several defenses, including voluntariness of conduct, and strategy in focusing on lack of intent for greater offense of murder was not objectively unreasonable).

### Counsel's Representation was not Deficient

Appellant has failed to meet his burden under the first prong of *Strickland*. Even assuming that the evidence in this case raised the issue of voluntariness of conduct, this Court should begin with a strong presumption that counsel was effective. *See Jackson*, 877 S.W.2d at 771. Importantly, the record does not contain any affirmative evidence explaining trial counsel's conduct, and counsel was not afforded an opportunity to explain his

21

challenged action. Hence, the record does not affirmatively support Appellant's ineffective assistance claim. *See Menefield*, 363 S.W.3d at 592.

In the absence of direct evidence explaining trial counsel's action in not requesting an instruction on voluntariness of conduct, this Court must assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined. *See Lopez,* 343 S.W.3d at 143. Appellant attempts to rebut the presumption of reasonable assistance of counsel by arguing the record demonstrates that trial counsel was mistaken or confused about the law regarding voluntariness of conduct, and "conflated the scenario testified to by [Appellant] with one in which a person points a gun at another and, absent third-party intervention, 'accidentally' fires." Appellant's Br. at 9. He argues that failure to request a voluntariness-of-conduct instruction was so outrageous that no competent attorney would have engaged in it. Appellant's interpretation of counsel's actions based on the record, however, is just that — a personal, self-serving interpretation of counsel's actions, which does not amount to affirmative evidence supporting a finding of inadequate representation. *See Menefield*, 363 S.W3d at 592; *Jackson*, 877 S.W.2d at 771. Rather than presuming, as Appellant asserts, that trial counsel was confused or mistaken about the relevant law, this Court should presume counsel's actions

22

and decisions were reasonably professional and were motivated by sound trial strategy. *See Lopez,* 343 S.W.3d at 14.; *see also Okonkwo*, 398 S.W.3d.

Indeed, an examination of the record reveals an objectively reasonable explanation for trial counsel's decision not to request a voluntariness-of-conduct instruction. Trial counsel's voir dire and closing argument clearly indicate that counsel's trial strategy was to focus on Appellant's lack of a culpable mental state for murder. The record reflects that trial counsel was unsure whether Hawkins, Appellant's co-defendant, would testify. Notably, during voir dire, although trial counsel briefly discussed manslaughter and criminally negligent homicide, trial counsel spent more time discussing self-defense than any other theory, indicating he may have anticipated the evidence to raise the issue. Trial counsel did not make an opening statement to summarize his defensive strategy. These facts show that counsel may have been unsure as to how Appellant's defense would unfold at trial and, as testimony was developed, counsel may have reasonably determined that focusing on minimizing Appellant's culpable mental state was a more prudent trial strategy.

In addition, in light of the evidence, trial counsel may have determined that the evidence Appellant knowingly and intentionally murdered Wilson or intended to cause serious bodily injury to him was strong and a voluntariness-

of-conduct defense was weak. Because Hawkins did not testify, Appellant was the *only* witness to testify that Hawkins grabbed him and caused the gun to discharge. Appellant's testimony was sharply controverted by the testimony of Whitaker, Nickerson, and Wadley, who testified that Hawkins was standing at least thirty to sixty feet — and at least arm's length — away from Appellant at the time Appellant fired the gun, and that no one bumped or grabbed Appellant causing the gun to discharge. *See Pouncy v. State*, No. 14-12-00470-CR, 2013 WL 3580638, at *4 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (mem. op., not designated for publication) (counsel not ineffective for failing to request multiple assailants instruction, in part because evidence of multiple assailants was strongly controverted). Even defense witness McKinney's recorded statement, which mentioned the scuffle between Appellant and Hawkins, did not reflect that the gun discharged involuntarily. Hence, trial counsel's failure to request a voluntariness-of-conduct instruction did not deprive Appellant of a defense supported by conclusive evidence.

Moreover, Wadley testified that the shooting was not an accident and was a deliberate "killing." Whitaker likewise testified that Appellant deliberately shot Wilson, and the shooting was not an accident. Prior to the shooting, Nickerson and Wadley heard Appellant say, "I want cash or flesh,"

24

and Whitaker heard Appellant state to Wilson, "Nigger, I shoot you," immediately before Appellant shot him.

In addition, Appellant admitted that he told an insurance agent that he killed Wilson. Appellant admitted being "extremely frustrated" and taking a loaded gun to the body shop. He admitted pointing a loaded gun at Wilson, who was not armed. He also admitted fleeing the crime scene, disposing of the murder weapon, and leaving the State of Texas, all of which undermined the plausibility of a potential defensive theory that he acted involuntarily. *See, e.g., Bigby v. State*, 892 S.W.3d 864, 883 (Tex. Crim. App. 1994) (explaining that the jury may infer the defendant's guilt of the charged offense from evidence of flight).

Without the testimony of Hawkins to support Appellant's testimony, trial counsel may have determined that the evidence of intentional and knowing murder or serious bodily injury murder was strong, a voluntariness-of-conduct defense was weak, and the best strategy was to focus on negating Appellant's mental state for murder. As such, the record supports a finding that trial counsel's choice not to argue a voluntariness-of-conduct defense was based on reasonable trial strategy, not on confusion or mistake about the law as Appellant's interpretation of the record suggests. *See Dannhaus*, 928 S.W.2d at 85-86. Hence, this Court cannot conclude that trial counsel's strategy in

"inviting" the jury to consider manslaughter and not focusing on voluntariness of conduct was an objectively unreasonable and strategically unsound strategy. *See id.*; *see also Hathorn v. State*, 848 S.W.2d 101, 118 (Tex. Crim. App. 1992) (holding that trying to get a jury to find a defendant guilty of lesser offense can be explained as sound trial tactic), *cert. denied,* 509 U.S. 932 (1993).

Appellant relies on *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005), to support his contention that this is a "rare case" where the record on direct appeal supports a finding of deficient performance. Appellant's Br. at 12. In *Andrews*, however, the Court of Criminal Appeals held that the error committed by trial counsel — failing to object to the prosecutor's misstatement of the law regarding whether the defendant's sentences could be stacked — could not be attributed to *any* reasonable trial strategy and was error as a matter of law. *Id.* at 103. Here, as discussed above, case law indicates that seeking to minimize a defendant's culpable mental state is reasonable trial strategy, and *Andrews* provides no guidance in the case at bar.

Finally, although in hindsight appellate counsel may disagree with trial counsel's strategy, such a disagreement does not render trial counsel's performance deficient. That another attorney, including Appellant's counsel on appeal, might have pursued a different course of action does not necessarily indicate ineffective assistance. *See Johnson v. State*, 959 S.W.2d 230, 236-37

26

(Tex. App.—Dallas 1997, no pet.); *Weeks v. State*, 894 S.W.2d 390, 391 (Tex. App.—Dallas 1994, no pet.). This Court should conclude that counsel's action fell within the wide range of reasonable professional assistance. *See Thompson*, 9 S.W.3d at 813. Because Appellant has not shown that trial counsel rendered deficient performance, this Court is not required to examine the second prong of *Strickland*. In any event, Appellant has failed to affirmatively prove prejudice under the second prong. *See Strickland*, 466 U.S. at 687; *Burruss*, 20 S.W.3d at 186.

**Appellant was not Prejudiced**

Appellant also fails to fulfill the second prong of *Strickland*. He argues, "If the jury had known that, under the defense's theory of the case, [Appellant] was in fact, not guilty of any type of criminal homicide, it's reasonably likely that that would not have been the verdict." Appellant's Br. at 11-12. Despite his contention, a review of the totality of the evidence presented at trial proves that even had trial counsel requested and the trial court included a voluntariness-of-conduct instruction in the charge, a reasonable probability does not exist that the jury would have acquitted Appellant. *See Ex parte Martinez*, 330 S.W.3d 891, 903 (Tex. Crim. App. 2011) (stating that the prejudice analysis under the second prong of *Strickland* requires appellate courts to "look at the totality of the evidence," and that even if the

27

inadmissible evidence had not been admitted, the evidence was sufficient to support the jury's guilty verdict).

Here, Appellant's lack of credibility and the evidence of his acts, words, and conduct proved Appellant's guilt of at least manslaughter. Appellant admitted that he took a loaded .38 revolver to the body shop and pointed it at Wilson. Evidence that the defendant arrived at the scene of the crime carrying a loaded weapon is probative of deliberate conduct. *Carter v. State,* 717 S.W.2d 60, 67 (Tex. Crim. App. 1986). When questioned about the amount of pressure it takes to shoot a .38 revolver, Appellant denied knowing how much pressure it takes to fire one, even though he was the one who fired the .38 that killed Wilson. Appellant's admission that he had carried a gun in the past, that he had purchased a gun from Wilson before — but incredibly did not remember where he got the .38 he used to shoot Wilson — indicated his guilt. *See Thomas v. State*, 699 S.W.2d 845, 849 (Tex. Crim. App. 1985) (holding that where a defendant familiar with guns and the potential for injury points a gun at the victim, the evidence indicates reckless conduct).

Although at trial Appellant claimed he was scared for his life to go the shop, the first time he mentioned this was at trial. At the shop, where he claimed he was scared for his life and surrounded by people he claimed to be scared of, he purported to have made threats to call the police and the

28

insurance company about the insurance fraud. Appellant admitted that he could have left the shop at any time; instead, he went outside and engaged in a further argument with and pointed a loaded gun at an unarmed Wilson.

Appellant's testimony that Hawkins's act in grabbing him caused the gun to discharge was self-serving and not credible. Even reading from a cold record, his testimony that, "For some strange reason, [Hawkins] grabbed my neck and shoulder area," rings hollow, especially in light of the four other witnesses whose testimony and statement indicated that Hawkins actively was attempting to persuade Appellant to leave the shop.

Appellant's flight from the crime scene also indicated his guilt. Appellant admitted that immediately after the shooting, he fled not only the crime scene, but also the State of Texas. He returned only after he discovered that Hawkins had turned himself in to police. These actions indicated to the jury that Appellant was conscious of his guilt and lessened the probability that the jury would have found he involuntarily shot Wilson and was not guilty of any crime. *See, e.g., Bigby,* 892 S.W.2d at 884 (stating that evidence of flight "shows a consciousness of guilt of the crime for which the defendant is on trial."). Finally, when Appellant did return to Texas, instead of going directly to the police, he first called the insurance agent to report the insurance fraud to set up his story.

Finally, the testimony all three of the State's witnesses controverted Appellant's testimony that Hawkins grabbed him and caused the gun to discharge. Although a scuffle and a grabbing did occur, Nickerson, Watkins, and Wadley all testified that Hawkins was more than arm's length away from Appellant when Appellant deliberately fired the gun. Even the testimony of McKinney, the defense witness, though unclear as to when Hawkins grabbed Appellant, did not indicate in any way that Hawkins's action in grabbing or scuffling with Appellant is what caused the gun to discharge. Instead, McKinney's on-the-scene, recorded interview, in which he even described the color and caliber of the gun Appellant used, credibly demonstrated that Appellant first pointed the gun at Wilson, told him not to move, then shot him deliberately with no interference by Hawkins.

Considering the overwhelming evidence of Appellant's guilt, Appellant has failed to establish that a reasonable probability exists that the result of the guilt-innocence stage of his trial would have been different but for trial counsel's alleged deficiency and his complaint fails. *See Strickland,* 466 U.S. at 695; *Thompson,* 9 S.W.3d at 812. This Court should overrule his first and second issues.

**RESPONSE TO APPELLANT'S THIRD POINT OF ERROR**

**This Court should modify the judgment to correctly reflect that the jury convicted Appellant of manslaughter.**

The State agrees that the judgment incorrectly reflects the offense for which Appellant was convicted. The jury returned a verdict of guilty of manslaughter, a second-degree felony. *See* Tex. Penal Code Ann. § 19.04(a) (West 2011). (RR5: 132; CR: 68). The judgment incorrectly states that the jury found Appellant guilty of "MURDER," with the degree of the offense as, "1ST DEGREE FELONY," and the statute for the offense as, "19.02 Penal Code." (CR: 48, 68).

This Court has the power to modify an incorrect judgment to make the record speak the truth when it has the necessary information before it to do so. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529-30 (Tex. App.—Dallas 1991, pet. ref'd). As set forth above, this Court has the necessary information to correct the judgment. Accordingly, the State respectfully requests this Court modify the trial court's judgment to correctly reflect the "Degree of Offense: 2nd Degree Felony," the "Offense for which Defendant Convicted: Manslaughter," and the "Statute for Offense: 19.04 Penal Code." *See* Tex.

Penal Code Ann. § 19.04(a); *Bigley*, 865 S.W.2d at 27-28; *Asberry*, 813 S.W.2d at 529-30.

## PRAYER

The State prays that this Honorable Court will affirm the trial court's judgment as modified.

Respectfully submitted,

 /s/ Marisa Elmore

Faith Johnson
*Criminal District Attorney*
Dallas County, Texas

Marisa Elmore
*Assistant District Attorney*
State Bar No. 24037304
Frank Crowley Courts Building
133 N. Riverfront Boulevard, LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*

## CERTIFICATE OF WORD-COUNT COMPLIANCE

I hereby certify that the foregoing brief, including all contents except for the sections of the brief permitted to be excluded by Rule 9.4(i)(1) of the Texas Rules of Appellate Procedure, is 7,438 words in length according to Microsoft Word 2010, which was used to prepare the brief, and complies with the word-count limit in the Texas Rules of Appellate Procedure. *See* Tex. R. App. P. 9.4(i).

 /s/ Marisa Elmore
Marisa Elmore

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing brief was served on Bruce Anton and Brett Ordiway, counsel for Appellant, by electronic communication through eFileTexas.gov on January 30, 2018.

 /s/ Marisa Elmore  
Marisa Elmore